[Civ. No. 48985. First Dist., Div. Four. June 22, 1981.]

BLUE CROSS OF NORTHERN CALIFORNIA, Plaintiff,
Cross-defendant, and Appellant, v.
KENNETH CORY, as State Controller, Defendant,
Cross-complainant, and Appellant.

724

726

COUNSEL

Joseph T. White, Jr., and Kathleen Courts for Plaintiff, Cross-defendant, and Appellant.

George Deukmejian, Attorney General, and Yeoryios C. Apallas, Deputy Attorney General, for Defendant, Cross-complainant, and Appellant.

OPINION

**RATTIGAN, Acting P. J.**—These appeals are from judgments entered on a determination by the superior court that funds represented by certain unnegotiated and unreturned checks have escheated to the State of California pursuant to the Unclaimed Property Law (hereinafter UPL). (Code Civ. Proc., § 1500 et seq.)[1]

Appellant and respondent Blue Cross of Northern California (Blue Cross) is a nonprofit hospital service corporation organized and doing business pursuant to the Nonprofit Hospital Service Plans Law. (Ins. Code, div. 2, pt. 2, ch. 11A [commencing with § 11491].) It offers contracts to the general public which obligate it to pay hospital, medical, and related benefits claimed by its premium-paying subscribers. During the period of time involved in this litigation, Blue Cross met its contractual obligations by writing and mailing checks to the subscribers entitled to payment. It similarly wrote and mailed checks to other persons. A large number of these checks were not negotiated by the payees and were not returned to Blue Cross, which eventually recorded their amounts as "miscellaneous income" received by itself.

---

[1]Except where expressly indicated otherwise, statutory citations in this opinion are to provisions of the Code of Civil Procedure which appear in the UPL or elsewhere. The UPL itself comprises chapter 7 ("Unclaimed Property Law," commencing with § 1500) of title 10 ("Unclaimed Property") of part 3 ("Special Proceedings"). The stated purpose of title 10 is "to provide for the receipt, custody, investment, management, disposal, *escheat and permanent escheat* of various classes of *unclaimed property*, to the possession of which the State is, or may become, entitled under the provisions of this title or under other provision of law." (§ 1305 [italics added].) As will appear in further detail, the UPL provides that "intangible personal property . . . that is held or owing in the ordinary course of the holder's business and has remained unclaimed by the owner for more than seven years . . . *escheats to this state*." (§ 1520 [italics added]; see fn. 4, *post.*)

Respondent and appellant Kenneth Cory, the State Controller, is charged by the UPL with the duties of administering and enforcing it. (See, e.g., §§ 1530, 1532, 1571-1572.) During a protracted controversy between the parties over a period of years, he took the position that the funds represented by Blue Cross checks not negotiated and paid for seven years had escheated to the State of California as unclaimed property, and that Blue Cross was accordingly required to report and pay the funds to him, pursuant to the UPL. Blue Cross commenced the present action, seeking a declaratory judgment to the contrary. The Controller cross-complained for declaratory relief in his favor and for recovery of funds claimed to have escheated to the state.

After a nonjury trial, the court filed findings of fact and conclusions of law in favor of the Controller on the complaint and his cross-complaint; entered a declaratory judgment substantially as prayed in the cross-complaint; and entered a money judgment obligating Blue Cross to pay him $676,028, representing $443,994 in escheated funds plus prejudgment interest in annual components calculated over a period of 13 years. Blue Cross appeals from both judgments. The Controller appeals from the money judgment, claiming error in the award of interest.

## THE PLEADINGS

Blue Cross commenced the action by filing a "Complaint For Declaratory Relief" against the Controller on September 16, 1975. In the format of a single cause of action, and in pertinent part, it alleged as follows:

Its "practice is to write off all outstanding checks over 4 years old in the middle of each year" by making "a journal entry ... debiting 'Bank Account' and crediting 'Checks Written Off—Financial Income.'" The Controller had currently "demand[ed] ... payment" by Blue Cross, pursuant to the UPL, of a specified "amount styled ... as 'currently escheatable'" and represented by "unclaimed checks resulting from benefit and vendor payments" made by Blue Cross. An "actual controversy" existed between the parties as to whether the UPL applied to these funds and whether they had escheated to the State of California as the Controller had claimed.

Based on extensive allegations of its contentions in the controversy, Blue Cross prayed for a declaratory judgment to the effects that the

UPL did not apply to it, nor to its unnegotiated checks, for various specified reasons; and that the Controller's claims to the funds were otherwise barred on several stated grounds.

On June 23, 1976, the Controller filed (1) an answer pleading material admissions, denials, and affirmative allegations; and (2) a cross-complaint in which he stated several causes of action against Blue Cross and prayed (as pertinent here) for a declaratory judgment to the effect that "sums payable on the ... checks have escheated to the State of California" and for "damages and interest as provided by statute ...."

Blue Cross answered the cross-complaint, pleading material admissions and denials and an array of affirmative defenses. The various affirmative defenses were subsequently amended.

### The Trial and the Judgments

The action was tried without a jury in February of 1979. The testimony, and the extensive documentary evidence, are summarized below. The court filed a memorandum decision in favor of the Controller. Blue Cross requested written findings of fact and conclusions of law. After consideration and settlement of voluminous findings and conclusions proposed by both sides, the court filed findings and conclusions in favor of the Controller and entered the two judgments described above. These appeals followed.

### The Appeal by Blue Cross

Although the contentions made by Blue Cross on its appeal from the two judgments are stated as abstract propositions, they are essentially addressed to the trial court's findings of fact and conclusions of law. The court stated one set of findings and conclusions on the issues joined on Blue Cross' complaint for declaratory relief, and a separate set on the issues joined on the cross-complaint. There is some necessary duplication and overlapping between the two sets, but we have assigned Blue Cross' contentions to one or the other as deemed appropriate. The findings and conclusions actually challenged on its appeal, and the pertinent evidence in each instance, are discussed below under separate captions.

*The Escheat of Money to the State Pursuant to the UPL*

The evidence on this subject may be summarized as follows: For more than 20 years before it commenced the action, Blue Cross did business under thousands of group and individual contracts which obligated it to pay for various medical, surgical, and hospital services rendered to its subscribers. In the regular course of this business, claims for payment were ordinarily received by Blue Cross on claim forms executed by the subscribers and submitted by the "providers" of the services. Each form was routed to a claims processor, who reviewed it to determine whether the services shown on it were covered by the claiming subscriber's contract; whether he was current in the payment of his premium; and the amount to which he was entitled in payment of the claim.

When the review of a claim had been completed, Blue Cross wrote a "benefit check" in the appropriate amount. Except where the services had been provided by a hospital, a benefit check was made jointly payable to the subscriber and to the "provider." It was then mailed to the subscriber at his address as shown on the claim form. Benefit checks were written and mailed at a rate of several hundred per day. Also in the regular course of its business, Blue Cross wrote "vendor checks" in payment of obligations incurred for supplies and services received by itself. Vendor checks were similarly mailed to the payees. A large number of benefit and vendor checks were not negotiated, presented, and paid, and were not returned to Blue Cross in any other way. After any check in either category had been outstanding for more than four years without having been negotiated, Blue Cross would "write it off" and "set it up as miscellaneous income" received by itself.

The checks "written off" were recorded in a "register" which was kept in the form of retrievable computer printouts. The register listed the checks by their numbers, dates of issue, and amounts. Some of the entries in the register showed the "ID number" of the person "entitled to the benefits" represented by an itemized check, but no payee was identified by name in any instance. A computer printout showing checks "written off" by Blue Cross over a period of more than 20 years was received in evidence.

Copies of the checks were not made, and there was no other source from which the payees of the "written off" checks could be identified. Subscribers who had submitted claims for benefits before 1966 could

not be identified by name because Blue Cross had destroyed its pre-1966 claims records pursuant to authorization received from the Insurance Commissioner.[2] Blue Cross would "honor" any "stale-dated check" if it were "still on the written off list."

The possibility that unclaimed funds represented by the "written off" checks had escheated to the State of California, pursuant to the UPL, was brought to the attention of Blue Cross during a routine audit conducted by the Insurance Commissioner in 1961. (See fn. 2, *ante.*) Relying on its attorney's opinion that it was exempt from the UPL, Blue Cross did not report the funds to the Controller at that time. In a letter written to Blue Cross in 1966, the Controller disputed its claim of exemption and requested that it "report" to him any "amounts" which had "remained unclaimed for at least 7 years." Counsel for Blue Cross replied by letter, reiterating his opinion and stating his reasons. The controversy continued in successive stages until Blue Cross commenced the present action in 1975. Before that, Blue Cross did not at any time report to the Controller any unclaimed funds represented by its outstanding checks.

The trial court's pertinent findings of fact from the foregoing evidence, made on the Controller's cross-complaint, are reproduced in the margin.[3] On the basis of these findings and others, the court drew two conclusions of law on the cross-complaint to the effect that the total sum tabulated in finding No. 8 had escheated to the state pursuant to the UPL.

---

[2]Blue Cross and other nonprofit hospital service plan corporations function under the regulatory authority of the Insurance Commissioner. (See, e.g., Ins. Code, §§ 11504-11507, 11509-11511, 11512.3, 11513, 11513.1, 11513.2, 11514-11515.5, 11517.)

[3]These findings may be quoted as follows:

"3. Blue Cross in the ordinary course of its business offers group and non-group hospital-surgical medical contracts to the general public.

"4. In the course of ... this business, benefits are occasionally owed for which Blue Cross issues and mails checks to the contract holders ... which are never cashed.

"5. Since at least September 18, 1955, Blue Cross, in the ordinary course of its business, has issued benefit and vendor checks which have remained uncashed for seven years or longer.

"6. Checks which remain outstanding for four years are 'written off' in the fifth year by ... a journal entry.

"7. When Blue Cross mailed a check to ... [a] ... subscriber, it was not as an offer to settle an unliquidated claim, but as payment of an unconditional obligation. Blue

The two conclusions of law are quoted and discussed later in this opinion. Blue Cross challenges them on the ground that only money which is *unconditionally* "owing" by its holder may escheat (citing *In re Mercantile Guaranty* (1968) 263 Cal.App.2d 346, 352 [69 Cal.Rptr. 361]) and this was not shown as to the funds represented by its outstanding checks because each check was written and mailed as an "offer of settlement" of an "unliquidated claim" and not in payment of an "unconditional obligation." Blue Cross also contends that the total sum tabulated in finding No. 8 is inaccurate because of duplications and errors claimed to exist in the computer printouts from which the components of the total were compiled. These arguments amount to a challenge of findings 7, 8, and 9.

The first sentence of finding No. 7 was adapted almost verbatim from a finding proposed by Blue Cross itself. ■ Its challenge of the finding made in that sentence must therefore be rejected pursuant to the settled rule that a party may not be heard to complain on appeal of a finding that he requested. (*Kraus* v. *Willow Park Public Golf Course* (1977) 73 Cal.App.3d 354, 374-375 [140 Cal.Rptr. 744]; *Smith* v. *Royal Mfg. Co.* (1960) 185 Cal.App.2d 315, 320 [8 Cal.Rptr. 417].) The determination stated in the second sentence of finding No. 7 is supported by unqualified testimony received from an officer of Blue Cross at the trial.

It was also shown that each benefit check was written and mailed by Blue Cross pursuant to language in the payee-subscriber's contract pro-

Cross will honor all checks presented to it for payment regardless of when issued.

"8. For the years between May 1, 1964, to and including May 1, 1976, the following amounts remained outstanding for seven years or more:

| | |
|---|---|
| "May 1, 1964 | $ 3,180 |
| "May 1, 1965 | 17,640 |
| "May 1, 1966 | 23,395 |
| "May 1, 1967 | 20,015 |
| "May 1, 1968 | 22,823 |
| "May 1, 1969 | 31,323 |
| "May 1, 1970 | 30,648 |
| "May 1, 1971 | 34,811 |
| "May 1, 1972 | 37,247 |
| "May 1, 1973 | 46,746 |
| "May 1, 1974 | 58,588 |
| "May 1, 1975 | 59,513 |
| "May 1, 1976 | 58,265 |
| "TOTAL | $ 443,994. |

"9. There is no credible evidence which can support a rational inference that a certain percentage of the $443,994.00 was the product of duplications or erroneous payments by Blue Cross."

viding that Blue Cross "shall pay" him specified amounts for specified services rendered to him. Except in circumstances not presented here, words in a contract "are to be understood in their ordinary and popular sense. ..." (Civ. Code, § 1644.) ■ A contractual obligation defined by the imperative auxiliary "shall" is ordinarily understood to be mandatory and unconditional. (See *Gordon* v. *Harris* (1928) 94 Cal. App. 682, 683-685 [271 P. 779]; 17A C.J.S. (rev. 1963) Contracts, § 304, p. 156; 80 C.J.S., Shall, pp. 136-138.) Finding No. 7 is supported by substantial evidence. (See *Munoz* v. *Olin* (1979) 24 Cal.3d 629, 635-636 [156 Cal.Rptr. 727, 596 P.2d 1143].)

The challenge addressed to findings 8 and 9 is based on trial testimony to the effect that "judgmental" or clerical error "could" (or "would") have occurred in the review of claims and the writing of benefit checks by Blue Cross, and that these errors might have affected the accuracy of its computerized records of outstanding checks. It was also shown, however, that in 1975 personnel from the Controller's office had conducted an audit to determine the amounts of benefit and other checks written by Blue Cross. The auditors produced a report which they discussed with officers of Blue Cross. The parties stipulated at the trial that the officers of Blue Cross had "agreed with the amounts presented in the audit report as a fair representation of the unclaimed benefit payments still outstanding as of July 18, 1975." The "amounts presented" turned up in the trial court's finding No. 8 (see fn. 3, *ante*) after certain adjustments had been made which are not now disputed. These circumstances demonstrate that findings 8 and 9 are supported by substantial evidence. (See *Munoz* v. *Olin, supra*, 24 Cal.3d 629 at pp. 635-636; see also Witkin, Cal. Evidence (2d ed. 1966) § 505, p. 475.)

Blue Cross does not materially dispute other findings of fact from which the trial court drew the two conclusions of law mentioned above. The conclusions read as follows:

"1. Benefit and vendor checks issued by Blue Cross in the ordinary course of its business are subject to escheat pursuant to Code of Civil Procedure section 1520 since the proceeds thereof are intangible personal property held or owing in the ordinary course of Blue Cross's business.

"2. Blue Cross was required to report and deliver the proceeds of vendor and benefit checks which remained unclaimed for more than seven years after their issuance date [*sic*]."

We must now observe that the nomenclature used in these conclusions, and in some of the findings, does not comport with the literal terms of the provision of the UPL cited in conclusion No. 1. (§ 1520.) The deviations from the statutory language reflect misconceptions of fact and law which pervade the record and affect some points requiring resolution on the appeals. We are therefore required to analyze the quoted conclusions in light of the precise terms of section 1520. The process will permit us to paraphrase the conclusions in those terms, but without changing their essential meaning or effect.

Section 1520 provides that property which will escheat to the State of California includes "intangible personal property ... that is held or owing in the ordinary course of the holder's business and has remained unclaimed by the owner for more than seven years after it became payable or distributable ...."[4] "Checks" issued by Blue Cross did not meet this definition because a "check" is not in itself "intangible personal property" which could be "held or owing" by Blue Cross within the meaning of the statute. Where 'a check was not negotiated (or "cashed"), presented, and paid, there were no "proceeds" meeting the statutory definition because a check not negotiated (or "cashed") does not yield "proceeds."

The evidence shows that a benefit or vendor check was written by Blue Cross to the order of a payee, and mailed to him, by reason of his right to be paid its amount pursuant to his contract as a subscriber or vendor. This right was "intangible personal property" in the form of a "thing in action" (or "chose in action") which was transferrable by him as its "owner" (Civ. Code, §§ 953, 954)[5] and which is recognized in the UPL. (§ 1501, subd. (h).)[6]

---

[4]The statute reads in pertinent part: 1520. "All tangible personal property located in this state and, subject to Section 1510, all intangible personal property ... that is held or owing in the ordinary course of the holder's business and has remained unclaimed by the owner for more than seven years after it became payable or distributable escheats to this state. ...."

[5]As pertinent here, these statutes provide: 953. "A thing in action is a right to recover money ... by a judicial proceeding."

954. "A thing in action, arising ... out of an obligation, may be transferred by the owner...."

[6]This statute provides as follows: 1501. "As used in this chapter [i.e., in the UPL]:

" . . . . . . . . . . . . . . . .

"(h) 'Owner' means a depositor in case of a deposit, a beneficiary in case of a trust, or *creditor, claimant, or payee in case of other choses in action*, ... or his legal representative." (Italics added.)

A check written by Blue Cross was evidence of the thing in action, which would have been extinguished if and when the check were negotiated and paid, but it was the thing in action—not the check or its nonexistent "proceeds"—which remained "intangible personal property . . . held or owing in the ordinary course of the holder's [Blue Cross'] business . . . ."[7] It was the thing in action—not the check or its "proceeds"—which escheated to the state, and was payable to the state in money, if it "remained unclaimed by the owner" (the payee who was entitled to be paid the amount of the initial check) "for more than seven years after it became payable or distributable" (i.e., after the amount became payable to him pursuant to his contract with Blue Cross).

■ Paraphrased to comport with this analysis, the UPL, and the facts found by the trial court (see fn. 3, *ante*), conclusion of law No. 1 is a determination that money in the amount of any benefit or vendor check written by Blue Cross was "subject to escheat pursuant to Code of Civil Procedure section 1520" because the payee's right to receive the money was "intangible personal property held or owing in the ordinary course of Blue Cross' business." Thus paraphrased, the conclusion is correct by operation of section 1520. (See fn. 4.)

Similarly paraphrased, conclusion of law No. 2 is a determination by the trial court that money in the amount of any benefit or vendor check had escheated to the state, and that Blue Cross was obligated to report and deliver the money to the Controller, where the check had not been negotiated and paid and where the money had "remained unclaimed by the owner" (the payee of the check) "for more than seven years" after the check had been issued. Thus paraphrased, the conclusion is correct by reason of the escheat provisions of section 1520 and the reporting and delivery requirements prescribed in sections 1530 and 1532.[8] Conclusions 1 and 2 support the judgments.

[7]Blue Cross was the "holder" pursuant to Code of Civil Procedure section 1501, subdivision (f), which provides in pertinent part: "'Holder' means any person in possession of property subject to this chapter [i.e., to the UPL] belonging to another, or who . . . *is indebted to another on an obligation* subject to this chapter." (Italics added.)

[8]As pertinent here, these sections respectively provide: 1530. "(a) Every person holding funds or other property escheated to this state under this chapter [i.e., under the UPL] *shall report to the State Controller* as provided in this section.

"(b) The report shall be on a form prescribed or approved by the Controller . . . .

" . . . . . . . . . . .

"(d) The report shall be filed before November 1st of each year as of June 30th or fiscal year-end next preceding . . . ." (Italics added.)

1532. "(a) . . . [E]very person who has filed a report as provided by Section 1530 shall, within six months from the final date for filing reports as required by Section

### The Controller's "Derivative Rights"

Blue Cross correctly points out that the Controller's rights under the UPL are "derivative," and that he accordingly succeeds to whatever rights the owner of unclaimed property may have and no more. (*Bank of America* v. *Cranston* (1967) 252 Cal.App.2d 208, 211 [60 Cal.Rptr. 336].) It is argued from this premise that the Controller cannot recover "uncashed checks" because he cannot meet the burden of showing delivery of any outstanding check, and the check itself or secondary evidence of it, which would be borne by its "owner" bringing an action on it. (See Cal. U. Com. Code, § 3102, subd. (1)(a); § 3122, subd. (1)(b); § 3302, subd. (2).)

No findings of fact or conclusions were stated in this regard, and none were necessary. The Controller is not seeking to recover "uncashed checks"; he is not maintaining an action on any outstanding Blue Cross checks; and he is not carrying any evidentiary burdens which might apply if he were. As we have indicated above, he is seeking the recovery of *money* (not "checks") which has escheated to the state, pursuant to section 1520, because it was "owing in the ordinary course of the holder's business and has remained unclaimed by the owner for more than seven years after it became payable ....." (See fn. 4 and the accompanying text, *ante.*) This contention by Blue Cross is utterly without merit.

### *The Claim that Blue Cross was Exempted from the UPL by Section 1410 as Amended*

Section 1410 appears in chapter 5 ("Escheat Proceedings") of title 10 of part 3 of the Code of Civil Procedure, and precedes the UPL under that title. (See fn. 1, *ante.*) Since its enactment in 1951, section 1410 has included detailed provisions requiring the Attorney General to commence and maintain actions for the purpose of adjudicating the state's title to unclaimed property claimed to have vested in it by escheat. (See Stats. 1951, ch. 1708, § 5, pp. 3946-3947; see also present § 1410.) The statute was amended in 1965 to include this sentence: "Notwithstanding any other section or provision of this code or any other statute, rule,

---

1530, *pay or deliver to the State Controller all escheated property specified in the report.*

"(b) If ... it appears that for some ... reason the property is not subject to escheat under this chapter, the holder need not pay or deliver the property to the State Controller, but in lieu thereof shall file with the State Controller a written explanation of ... the reason the property is not subject to escheat...." (Italics added.)

regulation, law or decision, moneys held by trust funds for purposes of providing health and welfare, pension, vacation, severance, supplemental unemployment insurance benefits or similar benefits shall not pass to the state or escheat to the state." (Stats. 1965, ch. 2066, § 2, pp. 4810-4812.) The 1965 enactment also amended Probate Code section 231 to include the same sentence. (*Id.*, § 1, p. 4810.) The sentence was deleted from section 1410 by a 1972 enactment which also added section 1521 to the UPL. (Stats. 1972, ch. 856, § 1 [pp. 1521-1523]; *id.*, § 4 [pp. 1524-1525].)[9]

■ Blue Cross asserted in its complaint for declaratory relief that it was exempt from the UPL while the sentence appeared in section 1410. The trial court rejected this assertion, stating in a conclusion of law on the complaint that "Code of Civil Procedure section 1410 as amended in 1965 does not exempt Blue Cross from the provisions of the UPL." Blue Cross challenges this conclusion, contending that it held money in "trust funds for purposes of providing health ... benefits" within the meaning of the amended statute. This contention is based in part on the undisputed facts that Blue Cross is a "charitable nonprofit corporation" and is exempt from federal and state income taxes.

No provision of the UPL defined "trust funds" for purposes of the quoted sentence while it appeared in section 1410. Fairly read, however, the sentence appears to have reached only "trust funds" maintained by or on behalf of *employers*, individually or with others, for the purpose of providing the specified "benefits" to their *employees*. The sentence was given that interpretation when it was added to section 1410 in 1965. (See Review of Selected 1965 Code Legislation (Cont.Ed.Bar 1965) pp. 215-216; see also Historical Note, 19A West's Ann. Code Civ. Proc. (1972 ed.) § 1410, p. 312.) The same interpretation is supported by a fair reading of the provisions of the 1972 enactment which deleted the sentence from section 1410 and reenacted its substance in section 1521, subdivision (b), in narrower terms addressed to "employee benefit trust distributions" only. (See fn. 9, *ante.*)

---

[9]As added in 1972, section 1521 provides in subdivision (a) that "[e]xcept as provided in subdivision (b), and subject to Section 1510, all employee benefit trust distributions and any income or other increment thereon *escheats* to the state" (italics added) in specified circumstances; and in subdivision (b) that under certain detailed conditions an "employee benefit trust distribution ... shall *not* escheat to this state ...." (Italics added.) The 1972 enactment also amended section 1501 to define the term "'[e]mployee benefit trust distribution'" (Stats. 1972, ch. 856, § 2, pp. 1523-1524) and amended conforming language into Probate Code section 231. (*Id.*, § 5, p. 1525.)

There was no evidence that Blue Cross was a "trust fund" within the meaning of the sentence as interpreted above, and its status as a "charitable nonprofit corporation" with tax-exempt status does not show that it was. The director of its underwriting division explicitly testified that it "enter[ed] into contracts with employee benefit trusts," but that it did not "act as a trustee, per se." The trial court correctly concluded that "section 1410 as amended in 1965" did "not exempt Blue Cross from the provisions of the UPL."

### The "Claims Withdrawal Provision" in Certain Blue Cross Contracts

Some subscriber contracts executed and performed by Blue Cross between 1974 and 1976 included a so-called "claims withdrawal provision" which typically read as follows: "Should the subscriber . . . fail to negotiate any check issued by Blue Cross in payment of the claim within a period of six months from the date of such check, then and in that event, the claim shall be deemed withdrawn and shall not be considered in the determination of subscription charges for continued coverage hereunder. Nothing herein shall prevent resubmission of said claim."

The provision originally appeared in contract texts approved by the Insurance Commissioner. (See fn. 2, *ante.*) In 1976, the Controller informed the Insurance Commissioner of his view that the provision had been added to Blue Cross contracts in an attempt to avoid the escheat of money pursuant to the UPL. The Insurance Commissioner agreed, and revoked his approval of the provision effective August 20, 1976. While the provision was in effect before that, Blue Cross stopped payment of any benefit check not negotiated by the payee-subscriber within six months of its issuance.

■ Blue Cross contended in its complaint for declaratory relief that the claims withdrawal provision was valid. The trial court determined to the contrary in a finding of fact and a conclusion of law on the complaint, and combined them in a paragraph of the declaratory judgment which reads in pertinent part: ". . . [T]he claims withdrawal provision . . . is null and void and therefore unenforceable because it is a private escheat law and as such it is contrary to the public policy expressed in the Unclaimed Property Law. Unclaimed funds arising out of contracts containing the claims withdrawal provision shall be subject to the Unclaimed Property Law."

Blue Cross challenges this determination, arguing (1) that a benefit check is written and mailed by it as an "offer of settlement" which is subject to acceptance by the payee-subscriber and (2) that the claims withdrawal provision is an "entirely proper and valid contractual agreement" because it operates only to limit the period within which the "offer of settlement" may be accepted. The first premise fails by reason of the trial court's contrary determination in its finding No. 7 on the cross-complaint (see fn. 3, *ante*), which we have previously sustained as supported by substantial evidence.

The second premise also fails. The objectives of the UPL are to protect unknown owners of property by providing a means for locating them and restoring the property to them, and "to give the state rather than the holders of unclaimed property the benefit of the use of it, most of which experience shows will never be claimed." (*Douglas Aircraft Co. v. Cranston* (1962) 58 Cal.2d 462, 463 [24 Cal.Rptr. 851, 374 P.2d 819, 98 A.L.R.2d 298]; *Screen Actors Guild, Inc. v. Cory* (1979) 91 Cal.App.3d 111, 115 [154 Cal.Rptr. 77].) Comparable to a similar contractual provision which was invalidated in *Screen Actors Guild*, the claims withdrawal provision in Blue Cross contracts would effectively frustrate the second objective by denying the state the benefit of the funds represented by outstanding checks and not claimed for seven years. (See *Screen Actors Guild, Inc. v. Cory, supra*, at p. 115.) The following language adapted from that decision controls here: "... [The claims withdrawal provision] ... is contrary to a policy of express law, although not expressly prohibited. (See Civ. Code, § 1667; *Winkleman v. Sides* (1939) 31 Cal.App.2d 387, 404-405 [88 P.2d 147].) Moreover, the UPL, as a law established for a public reason, cannot be contravened by a private agreement .... (Civ. Code, § 3513.) In short, a private escheat law cannot circumvent the effect of a public one. (*State v. Jefferson Lake Sulphur Co.* (1962) 36 N.J. 577, 596 [178 A.2d 329, 338-339], cert. den., 370 U.S. 158 [8 L.Ed.2d 402, 82 S.Ct. 1253].)" (*Screen Actors Guild, Inc. v. Cory, supra*, 91 Cal.App.3d 111 at pp. 115-116 [fn. omitted].) The trial court properly employed the substance of this language in the declaratory judgment. The claims withdrawal provision is invalid as a matter of law.

### The Statute of Limitations

Among its affirmative defenses to the Controller's cross-complaint, Blue Cross alleged that his recovery of the funds claimed to have escheated was barred in part by each of several statutes of limitations.

The trial court rejected these defenses in its conclusion of law No. 6 on the cross-complaint, stating in omnibus terms that "[t]he Controller's claim is not barred by the statute of limitations." Blue Cross challenges this conclusion, contending that recovery of money by the Controller is barred in part by the three-year limitation of section 338, subdivision 1, because his cross-complaint is an "action upon a liability created by statute" within the meaning of that section.[10]

Section 338, subdivision 1, will apply to bar an action reached by it "unless where . . . a different limitation is prescribed by statute." (See § 312 as quoted in fn. 10, *ante.*) Section 1570 of the UPL provides in pertinent part: "The expiration of any period of time specified by statute . . ., during which an action or proceeding may be commenced or enforced to obtain payment of a claim for money . . . *from the holder*, does not prevent the money . . . from being escheated, nor affect any duty to file a report required by this chapter [i.e., by the UPL] or to pay or deliver escheated property to the State Controller." (Italics added.) The omnibus language of the trial court's conclusion of law No. 6 indicates that the court disallowed the defense of any statute of limitations on the theory that a "different limitation" (i.e., no limitation at all) was "prescribed" in section 1570 as to the Controller's cross-action. ■ The Controller stands on this theory, arguing that section 1570 abrogates the defense of statute of limitations in an action brought by him to recover unclaimed property from its holder pursuant to the UPL.

We disagree with the Controller on this point. The language of present section 1570 appeared in substance as section 1515 of the UPL when the latter was first enacted in 1959. (Stats. 1959, ch. 1809, § 2, p. 4304; see *Douglas Aircraft Co.* v. *Cranston, supra,* 58 Cal.2d 462, 463.) The Legislature amended section 1515, and renumbered it as sec-

---

[10]Section 338 appears in title 2 ("Time Of Commencing Civil Actions") of part 2 of the Code of Civil Procedure. It must be read in context with sections 312 and 335, which precede it in title 2. In their numerical sequence, and as pertinent, the three sections provide:

312. "Civil actions . . . can only be commenced within the periods prescribed in this title, after the cause of action shall have accrued, unless where, in special cases, a different limitation is prescribed by statute.
" . . . . . . . . . . . . . . ."

335. "The periods prescribed for the commencement of actions other than for the recovery of real property, are as follows:
" . . . . . . . . . . . . . . ."

338. "Within three years:
"1. An action upon a liability created by statute, other than a penalty or forfeiture."

tion 1570, in 1968. (Stats. 1968, ch. 356, § 42, p. 755.) The Supreme Court had meanwhile held in *Douglas Aircraft* that section 1515 was not retroactive and that it "must be interpreted as applying only to claims on which the statute of limitations had not run," as between the holder of unclaimed property and its owner, "on the effective date" of the UPL in 1959. (*Douglas Aircraft Co.* v. *Cranston, supra,* at p. 466.) It necessarily followed from that holding that the running of a statute of limitations on a claim before the effective date of the UPL, as between the holder and the owner, remained available to the holder as a defense in an action brought against him by the Controller for the recovery of the property. *Douglas Aircraft* therefore refuted the theory that section 1515 abrogated *any* statute of limitations as a defense in *any* action brought by the Controller to recover unclaimed property from its holder pursuant to the UPL.

When the Legislature renumbered section 1515 as section 1570 in 1968, it took explicit notice of *Douglas Aircraft,* and amended the statute to conform to the decision by adding the words "from the holder" where they now appear, but it intended no substantive change which would have altered the effect of the decision. (See 8 Cal. Law Revision Com. Rep. (1967) pp. 1053-1054; Cal. Law Revision Com. com. to Code Civ. Proc., § 1570, 19A West's Ann. Code Civ. Proc. (1972 ed.) pp. 411-412; see also § 1570 as quoted *supra.*) We conclude from this sequence that section 1570 did not abrogate the defense of *any* statute of limitations in the Controller's cross-action Blue Cross. Specifically, it did not eliminate section 338, subdivision 1, as a defense to the cross-complaint if the bar of the statute applied in both law and fact.

For purposes of section 338, subdivision 1, "'[a] liability created by statute is one in which no element of agreement enters. It is an obligation which the law creates in the absence of an agreement.' [Citations.]" (*People* v. *Wilson* (1966) 240 Cal.App.2d 574, 576 [49 Cal. Rptr. 792].) Section 338, subdivision 1, "applies only where the liability is embodied in a statutory provision *and* was of a type which did not exist at common law." (2 Witkin, Cal. Procedure (2d ed. 1970) Actions, § 342, p. 1183 [italics in the original].) The liability of the holder of escheated money to the Controller meets these definitions because it is created by the UPL exclusively; it involves no element of agreement between the parties mentioned; and its equivalent did not exist at common law, which recognized the doctrine of escheat as an incident of the feudal system affecting land alone. (30A C.J.S. (rev. 1965) Escheat, § 1,

pp. 913-914.) The bar of section 338, subdivision 1, was therefore available as a defense to the Controller's cross-complaint in point of law.

■ It nevertheless fails as a defense in point of fact. Blue Cross in effect views the statute as barring the Controller's recovery of any money which had escheated to the state more than three years before he filed his cross-complaint on June 23, 1976. Blue Cross thus presupposes that the Controller's cause of action for recovery of any of the money accrued as and when it escheated, by operation of section 1520, at the moment in time when it had gone "unclaimed by the owner for more than seven years after it became payable . . . ." (See fn. 4, *ante.*) This view is incorrect. The Controller's cause of action for the recovery of unclaimed money accrues when the holder becomes obligated to pay it to him. (See *Collins* v. *County of Los Angeles* (1966) 241 Cal. App.2d 451, 454 [50 Cal.Rptr. 586]; *Los Angeles Co.* v. *Metropolitan C. Ins. Co.* (1933) 135 Cal.App. 26, 28 [26 P.2d 699].) Section 1532, subdivision (a), fixes that time at six months after the holder has reported it to him in any year as required by section 1530. (See fn. 8, *ante.*) This means that no statute of limitations will commence to run against his recovery of unclaimed money, pursuant to the UPL, unless —and until six months after—the holder has reported it in compliance with section 1530.

The three-year period of section 338, subdivision 1, did not commence to run here because Blue Cross did not at any time report to the Controller the unclaimed money it was holding in the amounts of its outstanding checks which had not been negotiated for more than seven years. The statute does not bar the Controller's recovery of the money as claimed.

### Laches

Among its affirmative defenses to the cross-complaint, Blue Cross alleged that the Controller had "unreasonably delayed enforcement" of the UPL against it, and that relief on the cross-complaint was barred by "the equitable principles of laches." The trial court rejected this defense in its findings of fact and conclusions of law on the cross-complaint. Blue Cross claims error.

■ The doctrine of laches applies in equitable actions alone. (*Bagdasarian* v. *Gragnon* (1948) 31 Cal.2d 744, 752 [192 P.2d 935]; *Bodily* v. *Parkmont Village Green Home Owners Assn., Inc.* (1980) 104 Cal.

App.3d 348, 358 [163 Cal.Rptr. 658]; 7 Witkin, Summary of Cal. Law (8th ed. 1974) Equity, § 14, par. (2), p. 5240.) It was not available as a defense to the Controller's cause of action against Blue Cross for the recovery of the unclaimed money, which sounded as an action at law and not in equity. (See § 592; *Abbott* v. *City of Los Angeles* (1958) 50 Cal.2d 438, 461-462 [326 P.2d 484]; *Philpott* v. *Superior Court* (1934) 1 Cal.2d 512, 514-516 [36 P.2d 635, 95 A.L.R. 990]; 2 Witkin, Cal. Procedure, *op. cit. supra*, Actions, § 66, pp. 940-941.) Laches was not made available as a defense by the fact that his cross-complaint included a cause of action for declaratory relief. (*Abbott* v. *City of Los Angeles, supra*, at p. 462; *McCullough* v. *Jones* (1970) 11 Cal.App.3d 270, 275 [89 Cal.Rptr. 646].) We may thus reject this contention by Blue Cross on the ground that the defense of laches has no place in the action as a matter of law.

As an alternative ground of decision on the claim, we also reject it in point of fact. The trial court concluded on the cross-complaint that "[t]he Controller is not guilty of laches." This conclusion was based on findings that the Controller "did not unreasonably delay in bringing the compliance action" embodied in his cross-complaint, and that he had never "acquiesced" in Blue Cross' contention that the unclaimed money was exempt from the operation of the UPL. The court also made a finding that "Blue Cross had the interest-free use" of the money for at least 11 years, which was in effect a finding that it had not been prejudiced by any delay on the part of the Controller. These findings are supported by the evidence. They dispel the factual elements essential to the defense of laches, which are "unreasonable delay plus either acquiescence or prejudice." (*People* v. *Department of Housing and Community Dev.* (1975) 45 Cal.App.3d 185, 195 [119 Cal.Rptr. 266].)

*Prejudgment Interest*

Civil Code section 3287, subdivision (a), provides in pertinent part: "Every person who is entitled to recover damages certain, . . . and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day . . . ." The trial court invoked this statute by finding on the Controller's cross-complaint (1) that the "sums" of unclaimed money at issue were "certain," and (2) that the right to recover them had "vested in the Controller on May 1 of each year from 1964 to and including 1976 pursuant to Code of Civil Procedure section 1532." In a conclusion of law on the cross-complaint, the court applied Civil Code section 3287, subdivision (a), by awarding

the Controller prejudgment interest at 7 percent per annum on each of the amounts tabulated in its finding No. 8, from its respective "May 1" date shown there (see fn. 3, *ante*) to July 31, 1979. The amount of the money judgment in the Controller's favor ($676,028) is the sum of the principal recovered ($443,994) and the several items of interest awarded.

Blue Cross does not dispute the dates used in the award of prejudgment interest, but it contends that Civil Code section 3287, subdivision (a), does not support the award because the amounts involved were not "certain." This argument amounts to a challenge of the sufficiency of the evidence to support the first finding quoted above, and it essentially repeats the challenge which Blue Cross addressed to findings 7 and 8 on the same ground. We have held that findings 7 and 8 are supported by substantial evidence. That evidence also supports the finding that the amounts were "certain."

Blue Cross disputes the application of Civil Code section 3287, subdivision (a), on additional grounds involving section 1577 of the UPL itself. Section 1577 expressly provides that a person who is delinquent in paying unclaimed money to the Controller "shall pay" interest on it at the rate of 12 percent per annum.[11] The section did not take effect until January 1, 1977 (see fn. 11, *ante*), and the trial court reached a determination that it did not apply in the present case after that date. Blue Cross contends that the determination precludes any award of prejudgment interest (pursuant to Civ. Code, § 3287, subd. (a), or otherwise) on the ground that section 1577 is the *exclusive* statutory source authorizing such award in conjunction with the Controller's recovery of unclaimed money pursuant to the UPL. The court's determination relative to section 1577 does not appear in its findings of fact and conclusions of law, but it stated in its memorandum decision as follows: "... [D]uring 1966 the Controller and Blue Cross exchanged several pieces of correspondence and ... on May 27, 1966, Blue Cross gave written explanation why the property [*sic*] ... is not subject to escheat.... [¶] ... Code of Civil Procedure section 1577 is inapplicable

---

[11]Section 1577 was added to the UPL in 1976. (Stats. 1976, ch. 49, § 3, p. 81.) It provides as follows: "In addition to any damages, penalties, or fines for which a person may be liable under other provisions of law, any person who fails to report or pay or deliver unclaimed property within the time prescribed by this chapter, *shall pay to the State Controller* interest at the rate of 12 percent per annum on such property or value thereof *from the date such property should have been paid or delivered.*" (Italics added.)

in that ... [section 1532, subdivision (b)] ... allows a holder to give the State Controller a written explanation of a reason why the property is not subject to escheat. Upon giving this explanation, the holder 'need not pay or deliver the property to the State Controller.' ... Section 1577 permits interest at 12 percent from the date such property should have been paid or delivered to the State Controller. Since Blue Cross gave written explanation, the property is not yet payable or deliverable. Therefore interest will not lie under ... Section 1577. [¶] ... [The] claim of the Controller is a liquidated claim and accordingly the Controller is entitled to prejudgment interest at the rate of seven percent per annum commencing May 1, 1964."

These passages afford an explanation of the court's award of prejudgment interest at the uniform rate of 7 percent, pursuant to Civil Code section 3287, subdivision (a), rather than at the rate of 12 percent after January 1, 1977, pursuant to section 1577. We may properly resort to the passages for that explanation. (See 6 Witkin, Cal. Procedure, *op. cit. supra*, Appeal, § 231, pp. 4221-4222), but they also disclose an erroneous application of section 1532, subdivision (b). That subdivision provides that the holder of unclaimed money "need not pay" it to the Controller but "in lieu thereof shall file with the ... Controller a written explanation of ... the reason the property is not subject to escheat." (See fn. 8, *ante.*)

Stated another way, subdivision (b) of section 1532 provides that the holder may avoid or forestall the obligation of *payment* if he files the explanation instead. However, subdivision (a) of section 1532 provides that he is not obligated to make the payment unless he is a "person who has filed a report as provided by Section 1530," in which case he must make the payment within six months thereafter. (See fn. 8, *ante.*) Blue Cross is not such a "person" because it never reported the unclaimed money, in compliance with section 1530 or at all. The "explanation" it gave the Controller in 1966 therefore did not avail it at any time. ■ Its mere failure to *report* the money subjects it to prejudgment interest at the annual rate of 12 percent pursuant to the express provisions of section 1577 which have been in effect since January 1, 1977. (See fn. 11, *ante.*)

It follows that the court erred in not awarding the Controller prejudgment interest at the rate of 12 percent since January 1, 1977. In light of the court's evidence-supported finding that the principal amounts involved were "certain," the award made at the rate of 7

percent before that date was properly made pursuant to Civil Code section 3287, subdivision (a), which was both mandatory and in effect at the time. Blue Cross is incorrect in its argument that the enactment of section 1577 in 1976 amounted to a legislative declaration that Civil Code section 3287, subdivision (a), did not previously apply to unclaimed money recovered by the Controller pursuant to the UPL. The award of prejudgment interest must therefore be sustained on the appeal by Blue Cross.

## THE APPEAL BY THE CONTROLLER

The Controller's appeal from the money judgment raises the error in the award of prejudgment interest just discussed. He is entitled to relief from it by modification of the money judgment. On the remand ordered below, the trial court will modify the money judgment, nunc pro tunc, by recomputing each item of prejudgment interest awarded at the rate of seven percent (7%) per annum from its respective date of origin to and including December 31, 1976, and at the rate of twelve percent (12%) thereafter, to and including July 31, 1979, in each instance; by striking the present amount of interest shown in each item and inserting the recomputed amount; and by striking the total amount of the judgment presently shown in it as "$676,028.00" and inserting the greater total required by the recomputation of the items of interest.

The "Declaratory Judgment" entered on August 1, 1979, is affirmed. The cause is remanded to the trial court with directions to modify the "Judgment" entered on August 1, 1979, nunc pro tunc and in a manner consistent with this opinion. As so modified nunc pro tunc, the "Judgment" entered on August 1, 1979, is affirmed. The Controller shall recover his costs on both appeals.

Christian, J., and Poché, J., concurred.