**Gen. 21]**                                             **21**

## ABANDONED PROPERTY

### STATUTORY INTERPRETATION – MARYLAND 529 – WHETHER THE MARYLAND UNIFORM DISPOSITION OF ABANDONED PROPERTY ACT APPLIES TO ACCOUNTS IN THE PROGRAMS OFFERED BY MARYLAND 529

May 15, 2023

*Geoffrey F. Newman*
*Board Chair, Maryland 529*

Maryland 529 has asked whether the Maryland Uniform Disposition of Abandoned Property Act (the "Abandoned Property Act," or the "Act") applies to accounts in the three tax-advantaged college and disability savings programs that Maryland 529 offers. If the Act applies to the accounts, Maryland 529 has also asked for guidance on how to comply with it.

In our opinion, although Maryland 529 has not been explicitly exempted from the Act, the Act does not apply to Maryland 529 accounts. The Maryland 529 programs have tax advantages that facilitate long-term savings. These tax advantages encourage families to invest decades ahead of expected college or disability expenses so that market appreciation might help them meet their goals. The Act, in contrast, generally presumes property to be abandoned if left dormant for three years. Application of the Act's mandates would tend to interrupt family savings plans prematurely, trigger tax consequences and penalties that defy common sense, and clash with language in Maryland 529's enabling statutes that seeks to safeguard account funds from diversion to other State uses. For these reasons, we think the General Assembly did not intend the Act to apply to the accounts when it enacted the enabling statutes.

Given this conclusion, we need not offer guidance on how to apply the Act to the accounts. We note, however, that the Act likely *does* apply to sums payable on distribution checks that your agency issues that draw against 529 account balances. Thus, if such sums remain unclaimed for three years, Maryland 529 generally should presume that they are abandoned under the Act. We also note that Maryland 529 should consult the unclaimed property laws of other states, as opposed to the Act, for unclaimed accounts, checks, or other property that your agency holds for program participants with out-of-state addresses.

# I
# Background

### A.   *Maryland 529*

Maryland 529 offers three programs to help families save for specific types of expenses.[1] *See* Md. Code Ann., Educ. ("Educ.") § 18-1902.1; Revised Fiscal & Policy Note, S.B. 959, 2023 Leg., Reg. Sess. at 6. Two of the programs are college savings plans: the Maryland Senator Edward J. Kasemeyer Prepaid College Trust ("Prepaid Trust" or "MPCT"), and the Maryland Senator Edward J. Kasemeyer College Investment Plan ("Investment Plan" or "MCIP"). The third program, called the Maryland Achieving a Better Life Experience Program ("ABLE"), is for disability-related expenses.[2] Most states have similar programs. U.S. Gov't Accountability Off., GAO-13-64, *Higher Education: A Small Percentage of Families Save in 529 Plans* 10 (2012); ABLE National Resource Center, Map Tool, https://www.ablenrc.org/select-a-state-program/ (last visited Apr. 25, 2023).

The General Assembly established the programs to conform to two sections of the Internal Revenue Code: section 529, which authorizes federal tax benefits for investments in state college savings programs; and section 529A, which authorizes similar benefits for state ABLE programs. 26 U.S.C. §§ 529, 529A; *see* 87 *Opinions of the Attorney General* 137, 138 (2002) (discussing origins of the college savings plans). For convenience, we refer to all three Maryland 529 programs as "529 programs," and the accounts within them as "529 accounts," even though ABLE is technically a 529A program.

The three programs differ. As discussed in more detail later, the Prepaid Trust has defined benefits (the payment of in-state tuition), while the Investment Plan is a defined contribution program—families elect how much to invest without committing to a fixed education benefit. *See* 87 *Opinions of the Attorney General* at 138-40. ABLE is also a defined contribution program, but for disability instead of education expenses. Maryland 529, Maryland ABLE Disclosure Statement, at 6-7 (Dec. 1, 2021)

---

[1] Until 2016, Maryland 529 was called the College Savings Plans of Maryland. 2016 Md. Laws, ch. 39.

[2] A fourth program, the Maryland Broker-Dealer College Investment Plan, has been authorized by statute since 2008 but never implemented. Educ. § 18-19B-02(a); *see* Revised Fiscal & Policy Note, S.B. 959, 2023 Leg., Reg. Sess. at 8.

("ABLE Discl."), https://www.marylandable.org/assets/docs/mary
land-able-plan-disclosure-booklet.pdf.

All three programs, however, share a common element with
each other and with similar programs in other states: a package of
tax advantages and penalties designed to encourage people to save
early for college and disability expenses. *See* Fiscal & Policy Note,
H.B. 431, 2016 Leg., Reg. Sess., at 4 ("ABLE Fiscal Note"). The
primary advantage is tax-free investment growth. Earnings on
money invested through the programs are not subject to federal or
Maryland income taxes so long as they are spent as intended—that
is, on qualified educational expenses (in the case of the college
programs) or qualified disability expenses (in the case of ABLE).
*Id*. But if the investor withdraws funds from a 529 account and
does not use them for qualified expenses, federal and Maryland
income taxes generally apply, along with a ten percent federal tax
penalty. *See* 26 U.S.C. §§ 529(c)(3)(A) (cross-referencing 26
U.S.C. § 72), 529A(c); Maryland 529, MCIP Disclosure Statement,
at 2, 5 (2021-2022) (discussing the 10% "Distribution Tax")
("MCIP Discl."), https://maryland529.com/Portals/0/Files/MCIP_
Disclosure_Statement.pdf. For federal tax purposes, the framework
has similar features to Roth Individual Retirement Accounts
("IRAs"): investments consist of after-tax dollars that grow and
may be withdrawn tax-free so long as they go to the intended
purpose. The threat of penalties on top of taxes for non-qualified
withdrawals discourages people from straying from the purpose of
the savings plan. *See generally* Internal Revenue Service, Pub.
590-A, *Contributions to Individual Retirement Arrangements
(IRAs)* (2023) ("IRS Pub. 590-A"), https://www.irs.gov/pub/irs-
pdf/p590a.pdf.

Other Maryland and federal tax advantages for 529 accounts
supplement the possibility of tax-free earnings. Maryland offers an
annual State income deduction of up to $2,500 for contributions to
any of the 529 programs. Md. Code Ann., Tax-Gen. ("TG")
§ 10-208(n), (o), (v); ABLE Fiscal Note at 4. For State tax
purposes, then, annual contributions up to that amount consist of
*pre-tax* dollars that grow tax-free and may be withdrawn tax-free
so long as they ultimately go to qualified expenditures. Maryland
encourages people to frontload accounts by allowing them to carry
over annual contributions above $2,500 into subsequent tax years.
*See* TG § 10-208(n)(4), (o)(4), (v)(4). For example, a Maryland
taxpayer may contribute $25,000 to a 529 account and take the

annual deduction over ten years. *See id*.[3] The federal tax code also encourages frontloading. Contributions are considered a gift to the account beneficiary for federal tax purposes, but the code allows people to contribute five times the annual federal gift tax exclusion—currently $17,000 (or $85,000 when multiplied by five)—to a college savings plan and average out the contribution over the ensuing years to avoid gift tax consequences. 26 U.S.C. § 529(c)(2).[4] These frontloading incentives encourage people to maximize the tax-free earnings on an account by investing more money earlier.

The three Maryland 529 programs share another fundamental characteristic: fiduciary administration. In the enabling statutes for the programs, the General Assembly mandated in various ways that the State officials handling 529 assets must act only to further the interests of program participants. An eleven-member body called the Maryland 529 Board (the "Board") currently oversees all three programs. Educ. § 18-1904.[5] Board members are fiduciaries subject to bond requirements. *Id*. §§ 18-1907(a), 18-1908. In addition, the Board, as authorized by the enabling statutes, has

---

[3] For the Prepaid Trust, there is no limit to the number of years that a contribution may be carried over. TG § 10-208(n)(4). For the Investment Plan, the limit is ten additional, consecutive years beyond the year of the contribution, meaning that a maximum of $27,500 may ultimately be deducted for a frontloaded contribution. *Id*. § 10-208(o)(4); MCIP Discl. at 5-6. For ABLE, the Maryland statute allows ten years, TG § 10-208(v)(4), but federal law caps annual contributions at the gift tax exclusion (currently $17,000) plus some additional contributions if the beneficiary is working, 26 U.S.C. § 529A(b)(2)(B); Internal Revenue Service, *What's New–Estate and Gift Tax* at 6 (Dec. 20, 2022) (gift tax exclusion for 2023 is $17,000), https://www.irs.gov/businesses/small-businesses-self-employed/whats-new-estate-and-gift-tax#Form%20706%20Changes. These additional contributions are capped at the lower of the beneficiary's compensation for the current tax year or an amount equal to the Federal Poverty Level for a one-person household. 26 U.S.C. § 529A(b)(2)(B)(ii); *see* 2016 ABLE Fiscal Note at 3-4.

[4] This federal frontloading incentive does not apply fully to ABLE, due to the annual contribution cap. See 26 U.S.C. § 529A(b)(2), (c)(2).

[5] The Board consists of the Secretary of the Maryland Higher Education Commission, the State Superintendent of Schools, the State Treasurer, the State Comptroller, the Chancellor of the University System of Maryland, the Secretary of Disabilities, and five members of the public appointed by the Governor who "have significant experience in finance, accounting, investment management, or other areas that can be of assistance to the Board." Educ. § 18-1904(c).

established each of the three 529 programs as a trust, with Board members serving as the trustees. *Id*. §§ 18-1901(p), 18-19A-03(e)(1)(ii), 18-19C-03(e)(1)(iv); *see also, e.g.*, MCIP Discl. at 2 (describing the Board's June 13, 2001 Declaration of Trust for MCIP).[6]

The trust arrangement emphasizes that funds invested in each program may be used "solely for the benefit" of the participants and that "such funds will not and cannot . . . be diverted to other purposes." Letter from John K. Barry, Assistant Attorney General, to Securities and Exchange Comm'n, 1998 WL 178457, at *13 (Apr. 15, 1998). In nearly all circumstances, Maryland 529 may distribute funds from a 529 account only with the authorization of the person who established the account. Educ. § 18-19C-04 ("Distributions shall be requested by the designated beneficiary . . . ."); § 18-19A-04(b) ("Distributions shall be requested by the account holder."); § 18-1907(b)(1) (Board must manage MPCT "solely in the interest of the participants").[7] Further, the enabling statute for each program protects investments from diversion to public uses by mandating that funds "may not be considered money of the State and may not be deposited into the [State] Treasury."

---

[6] The General Assembly recently enacted legislation to abolish the Board and transfer responsibility for administering the Maryland 529 savings programs to the State Treasurer, effective June 1, 2023. 2023 Md. Laws, ch. 113 §§ 1, 2, 13. Under the legislation, the Treasurer succeeds the Board and assumes its fiduciary responsibilities with respect to the savings programs. *Id*. §§ 1, 2. The legislation also phases out the Prepaid Trust by prohibiting the creation of new accounts beginning on June 1, 2023, and requires the Treasurer to establish a process for reviewing claims against the Trust. *Id*. § 1. These measures respond to complaints of mismanagement of the Prepaid Trust. *See Hearing on S.B. 959 Before the Budget and Taxation Committee*, 2023 Leg., Reg. Sess., at 3 (Mar. 15, 2023) (written testimony of Treasurer Dereck E. Davis) (noting "concerns that account holders have raised about their earnings"). Although the legislation has significant ramifications for the administration of the savings programs and for the Prepaid Trust in particular, it does not bear upon your questions about the Abandoned Property Act. In addition, because the relevant portions of the legislation have yet to take effect, we continue to refer to the Board in this opinion as the entity responsible for administering the savings programs.

[7] The disclosure booklets for each program make this point in more detail. *See, e.g.*, MCIP Discl. at 28 ("Only you (or the Custodian or other legal agent, if applicable) can request a distribution, unless a valid court order directs otherwise."); MPCT Discl. at 23 ("[O]nly the Account Holder can control the use and distribution of the benefits in an account.").

Educ. § 18-1903(f) (referring to the Prepaid Trust); *see also* § 18-19A-05(c) (asserting the same for the Investment Plan), § 18-19C-05(c) (asserting the same for ABLE). In other words, an investment toward education or disability expenses in a 529 program cannot "be captured by the State." Letter from David S. Iannucci, Deputy Chief of Staff to the Governor, to Sen. Barbara A. Hoffman (Feb. 18, 1997), Bill File on S.B. 232, 1997 Leg., Reg. Sess. ("Hoffman Letter").

Across the three programs, as of mid-2022, Maryland 529 had more than $9 billion under management for about 300,000 beneficiaries: $7.8 billion for 270,428 beneficiaries in the Investment Plan; $1.1 billion for 27,683 beneficiaries in the Prepaid Trust; and $50.5 million for 4,937 beneficiaries in ABLE, by far the newest of the three programs. Maryland 529, 2022 Annual Report Summary, Cover Letter (Dec. 2022), https://maryland529.com/Portals/0/Files/AnnualReports/2022/20 22_MD529_Annual%20Report%20Summary.pdf.

We discuss each of the three programs in more detail below.

### 1.    *The Maryland Prepaid College Trust*

Established in 1997, the Prepaid Trust is the oldest of Maryland's 529 programs. 1997 Md. Laws, ch. 110. It "is analogous to a defined benefit pension plan." Revised Fiscal Note, H.B. 11, 2000 Leg., Reg. Sess., at 5 ("MCIP Fiscal Note"). Families pay in advance for in-state tuition years at public institutions of higher education in Maryland ("Maryland public colleges," for short). Educ. § 18-1909(a), (c); *see* Maryland 529, MPCT Disclosure Statement, at 3 ("MPCT Discl."), https://maryland529.com/Portals/0/Files/MPCT_Disclosure_State ment.pdf. They may choose to buy tuition years at community colleges, 4-year public colleges or universities, or a combination of these. Educ. § 18-1909(a); MPCT Discl. at 6.

To make the purchase, a family agrees to pay a specified amount into a Prepaid Trust account. Educ. § 18-1909(d). The family can opt to make a lump-sum payment up front or to spread the payment out over monthly or annual installments. MPCT Discl. at 24-28; *see* Educ. § 18-1909(d)(1). Because the Board invests the payments with the expectation that they will appreciate over time, prepaid tuition years are marginally cheaper for younger children with later projected college enrollment dates, notwithstanding the Board's expectation that college tuition will rise about five percent annually. MPCT Discl. at 21, 25-28; *see*

Educ. § 18-1909(c). In exchange for the payment, the Board agrees to pay a specified number of tuition years. Educ. § 18-1909(d)(10). If the beneficiary opts to enroll in a private or out-of-state college instead of a Maryland public college, the Prepaid Trust pays the tuition there up to the value of the in-state tuition benefit that the family purchased. MPCT Discl. at 8.

The enabling statute anticipates two types of participants for each Prepaid Trust account: the account holder, often a parent, who controls the account and makes the payments; and the beneficiary, who is to receive the benefit but does not control the account. Educ. § 18-1901(c), (m). These two individuals may in theory be the same—i.e., someone may open an account for him or herself—but the program framework contemplates that they will ordinarily be different. *See id*.; MPCT Discl. at 3. Either the account holder or the beneficiary must be a resident of Maryland or the District of Columbia. Educ. § 18-1909(b). The account holder may request a refund of the account payments, plus certain earnings attributable to them, at any time. Educ. § 18-1910; MPCT Discl. at 11. In the first three years after a prepaid account is opened, if a refund is requested, Maryland 529 withholds fifty percent of the earnings as a penalty. MPCT Discl. at 11.

As for the defined-benefit tuition payments, the account holder may request them as early as three years after opening the account, provided the beneficiary has reached their projected college enrollment year. MPCT Discl. at 8-9. These benefits are paid directly to the educational institutions, or to the beneficiary or account holder, and must be used no later than ten years after the beneficiary's projected college enrollment date, plus the number of tuition years purchased. MPCT Discl. at 10; *see* Educ. § 18-1909(d)(9).[8] At the expiration of this benefits period, unless the Board grants a waiver, the Prepaid Trust's obligation to pay tuition benefits terminates, and the payments cease to accrue earnings. MPCT Discl. at 12-13. The account holder may then request a refund or rollover the account to another 529 program. *Id*. at 13. Rollovers to other tax-advantaged college savings programs or to ABLE programs are available at all other times too, although not more than once per year and subject to some restrictions. *Id*. at 11.[9]

---

[8] The Board extends this benefits period for time that the beneficiary spends in active military service. Educ. § 18-1910(c)(2).

[9] Rollovers to the tuition programs of other states are subject to a penalty in the first three years, and rollovers to ABLE programs are

### 2. The Maryland College Investment Plan

Established in 2001, the Investment Plan offers tax-advantaged accounts that resemble the defined-contribution aspects of an IRA, but for education savings rather than retirement savings. 87 *Opinions of the Attorney General* at 139-40. Participants choose how much to invest in a range of portfolio options, and their returns are "based on investment performance, not tuition cost." MCIP Fiscal Note at 5. Unlike the Prepaid Trust, the Investment Plan is open for enrollment nationwide. Educ. § 18-19A-04(a). Like the Prepaid Trust, the Investment Plan distinguishes between account holders, who set up and control accounts, and beneficiaries. *Id.* § 18-19A-01.

An account holder may apply Investment Plan distributions, tax-free, to an array of "qualified higher education expenses"—not only college tuition, but also room and board, books and supplies, and up to $10,000 per year for elementary and secondary school tuition. 26 U.S.C. § 529(e)(3); MCIP Discl. at 3-4. Neither State nor federal law imposes any restrictions on when the account holder may withdraw funds. MCIP Discl. at 28. There is no waiting period to take distributions on the front end, and—unlike with an IRA—no point at which distributions become mandatory on the back end. *Id.*; *see* Internal Revenue Service, Pub. 590-B, *Distributions from Individual Retirement Arrangements (IRAs)* at 7 (2023) ("IRS Pub. 590-B"), https://www.irs.gov/pub/irs-pdf/p590b.pdf (discussing required minimum distributions from IRAs). The account holder may change the beneficiary at any time, apparently even after the original beneficiary's death, and there are no tax consequences so long as the new beneficiary is within the same extended family (out to first cousins) as the original beneficiary. 26 U.S.C. § 529(c)(3)(C)(ii); *see* MCIP Discl. at 3, 27. As with the Prepaid Plan, the account holder may generally roll funds over to other tax-advantaged college savings plans and ABLE programs, subject to some restrictions. 26 U.S.C. § 529(c)(3)(C)(i), (iii); MCIP Discl. at 30.[10]

---

subject to the annual ABLE contribution cap. MPCT Discl. at 11. Beginning in 2024, account holders may also rollover funds from long-term Prepaid Trust accounts to Roth IRA accounts with the same beneficiary, subject to certain restrictions. Secure 2.0 Act of 2022, Pub. L. No. 117-328, div. T, tit. 1, § 126, 136 Stat. 4459, 5316-18 (2022).

[10] As with the Prepaid Trust, starting in 2024, Investment Plan accounts may be rolled over to Roth IRAs in some circumstances. *See supra* note 9.

### 3. *Maryland ABLE*

Established in 2016, two years after Congress authorized the underlying federal tax advantages, Maryland ABLE seeks to "[e]ncourage and assist individuals and families in saving private funds to support individuals with disabilities to maintain health, independence, and quality of life." Educ. § 18-19C-02(b)(1); 2016 Md. Laws, ch. 39; Stephen Beck, Jr., Achieving a Better Life Experience Act of 2014, Pub. L. No. 113-295, div. B, 128 Stat. 4056-74 (2014). A person's savings in the program do not affect eligibility for State public benefits and will affect eligibility for federal means-tested public benefits only when balances exceed $100,000. *See id*. § 18-19C-02(b)(2); ABLE Discl. at 8, 20-23. The concept is to facilitate savings that "will supplement, not supplant, benefits." Educ. § 18-19C-02(b)(1). ABLE accounts are similar to Investment Plan accounts in that people choose how much to invest across a set of portfolio options. ABLE Discl. at 7.

Although anyone may contribute to an ABLE account, participants generally create accounts for themselves rather than on behalf of others. Educ. § 18-1901(b); ABLE Discl. at 14. In other words, unlike in the college savings plans, beneficiaries generally control their own accounts—the account holder "is the . . . beneficiary," as the statute puts it.[11] Educ. § 18-19C-01(d). A person is only eligible to open an account if they have a serious disability or blindness and such disability or blindness occurred before age twenty-six. 26 U.S.C. § 529A(e) (describing qualifying disabilities); Educ. § 18-19C-01(f).[12] There is no State residency requirement. *See* Educ. § 18-19C-04; ABLE Discl. at 33. Federal law caps annual contributions per account holder at the level of the gift tax exclusion, currently $17,000, plus the account holder's income up to the federal poverty level. 26 U.S.C. § 529A(b)(2)(B); ABLE Discl. at 7. The qualified disability expenses for which the account holder may take tax-free distributions encompass "any

---

[11] In all three 529 programs, an authorized legal representative, such as a guardian or person with power of attorney, may control the account on the account holder's behalf in some circumstances. ABLE Discl. at 1; MPCT Discl. at 3; MCIP Discl. at 6; *see also* S.B. 343, 2023 Leg., Reg. Sess. (enrolled) (providing that certain persons other than the designated beneficiary may establish and operate an ABLE account on behalf of the beneficiary, where the beneficiary is unable to do so independently).

[12] Starting in 2026, this age limit will increase to forty-six. Secure 2.0 Act of 2022, Pub. L. No. 117-328, div. T, tit. 1, § 124, 136 Stat. 4459, 5314 (2022).

expenses related to the eligible individual's blindness or disability," including those for education, housing, "health, prevention and wellness," and many others. 26 U.S.C. § 529A(e); Educ. § 18-19C-01(h). The account holder may take distributions or initiate rollovers to college savings programs at any time, subject to periodic limits (e.g., one distribution per day). Educ. § 18-19C-04(b); ABLE Discl. at 16, 39-40.

After the death of the account holder, ABLE funds may be distributed tax-free to cover funeral and burial expenses. 26 U.S.C. § 529A(e)(5). At this juncture, federal law also allows any state to obtain payment from the account for medical assistance that the state paid for the account holder under its Medicaid program after the account was established. 26 U.S.C. § 529A(f). Maryland, however, prohibits its State agencies from seeking such recovery from ABLE accounts, unless federal law requires otherwise. Educ. § 18-19C-10(b). Amounts in the account not subject to State claims may go to the beneficiary's estate or to another individual eligible to hold an ABLE account. *Id*. § 18-19C-10(a).

## B.    *Unclaimed Property Laws and Uniform Acts*

Every state has a law regulating "unclaimed" property—that is, property held by another for an owner who has left it unattended, who is unknown to the holder, or who cannot be found. *See* Uniform Law Commission, Revised Uniform Unclaimed Property Act, Prefatory Note, at 1, 3 n.8 (2016) ("RUUPA"). Unclaimed property can be a "drag on the economy," *Cerajeski v. Zoeller*, 735 F.3d 577, 579 (7th Cir. 2013), and, if left unregulated, results in windfalls to the banks and other people and entities who have the good fortune to hold it, *see Comptroller of Treasury v. PHH Corp.*, 123 Md. App. 214, 218 (1998).

Most of the state laws that address this problem are based on a series of uniform acts published by the Uniform Law Commission ("ULC").[13] *American Express Travel Related Servs., Inc., v. Sidamon-Eristoff*, 669 F.3d 359, 365 (3d Cir. 2012); RUUPA, Prefatory Note, at 1. In 1954, the ULC published the first of these uniform acts, called the Uniform Disposition of Unclaimed Property Act. RUUPA, Prefatory Note, at 1. Maryland's Act draws heavily from this first version, as discussed later. *See infra* Part I.C. Revisions to the uniform act followed under various

---

[13] The ULC is "also known as the National Conference of Commissioners on Uniform State Laws." Uniform Law Comm'n, https://www.uniformlaws.org/home (last visited Apr. 25, 2023).

names in 1966, 1981, 1995, and, most recently, in 2016. RUUPA, Prefatory Note, at 1. The uniform acts have a dual purpose: first, to protect property owners by creating a system for reuniting them with their property; and second, to transfer the windfall of unclaimed property to the state, so that it may be used for public benefit when the owners cannot be found. *Id*. at 3; Uniform Disposition of Unclaimed Property Act, Prefatory Note, at 2 (1954) ("1954 Uniform Act").

The uniform acts and the state unclaimed property laws based upon them descend from the common law tradition of escheat, under which the crown acquired title to the lands of a person who died without heirs. *Clymer v. Summit Bancorp*, 171 N.J. 57, 62-63 (2002). But most unclaimed property laws do not, in fact, provide for escheat. *Commonwealth Edison Co. v. Vega*, 174 F.3d 870, 872 (7th Cir. 1999); RUUPA, Prefatory Note, at 1. That is, under these laws, the state does not acquire ownership of unclaimed property but instead holds it as a custodian for the owner. *Id.* The owner may claim it at any time; in most states, no limitations period applies. *Vega*, 174 F.3d at 872 (noting that a state "does not acquire title" but is "merely a custodian," and "[t]he owner can reclaim his property at any time"); RUUPA, Prefatory Note, at 2 ("The state merely holds possession, indefinitely . . . ."); 1954 Uniform Act, Prefatory Note, at 2 ("The state takes custody and remains the custodian in perpetuity.").

Until the owner claims the property, the state uses it. It sells everything other than money and deposits the proceeds in the state treasury, holding a certain threshold in reserve to pay claims. *See, e.g.*, *Hall v. State*, 908 N.W.2d 345, 351 (Minn. 2018); RUUPA § 701. A state's possession of unclaimed property thus works like a "loan to the state—in perpetuity if the owner never shows up to claim it." *Vega*, 174 F.3d at 872. Some authorities thus refer to unclaimed property laws as "'modern' escheat statutes," *e.g.*, *Employers Ins. of Wausau v. Smith*, 154 Wis. 2d 199, 205 (1990), or "custodial escheat" statutes, *e.g.*, *Sidamon-Eristoff*, 669 F.3d at 365; Colo. Op. Att'y Gen. No. 2005-01, 2005 WL 4020083, at *3 (Apr. 13, 2005).

Strictly speaking, state laws based on the uniform acts focus on the regulation of unclaimed rather than "abandoned" property. *See* RUUPA, Prefatory Note, at 3 n.8 (distinguishing terms); *cf.* § 201 (referring to property that is "presumed abandoned"). Abandoned property is a more specific concept that refers to the "voluntary relinquishment or renunciation of a property right, or an ownership vacuum resulting from the owner's death without heirs

or a valid will." *Cerajeski*, 735 F.3d at 581. Put differently, abandoned property is a subset of unclaimed property. RUUPA, Prefatory Note, at 3 n.8 ("All abandoned property is also unclaimed, but not all unclaimed property is abandoned.").

Unclaimed property laws work by applying a presumption of abandonment to property that goes unclaimed for a set number of years known as a "dormancy period." *See Clymer*, 171 N.J. at 59; *PHH Corp.*, 123 Md. App. at 218. For example, under the current uniform act, traveler's checks are presumed abandoned if left unclaimed for a dormancy period of fifteen years. RUUPA § 201(1). Dormancy periods vary by property type. The 1954 uniform act set them at seven years for most types of personal property, including bank accounts and sums payable on uncashed checks. 1954 Uniform Act § 2(a), (c). These periods have become shorter over time; they settled at three years under the 1995 uniform act and remain at that length for most property types under the 2016 uniform act. RUUPA § 201 cmt. There are exceptions, such as for wages (one year) or for the aforementioned traveler's checks (fifteen years). RUUPA § 201(1), (11).

Even after the dormancy period has run, the holder must attempt to contact the owner before treating property as abandoned. For example, in Maryland, the holder must in most circumstances send a notice by first-class mail to the owner stating that, if the owner does not respond within 30 days, the property "will be considered abandoned." Md. Code Ann., Com. Law ("CL") § 17-308.2. If that does not work, the holder must report and transfer the property to the administrator of the State's unclaimed property fund. *See Sidamon-Eristoff*, 669 F.3d at 365. The State then attempts to locate the owner, usually by publishing information about the property in its custody. *See, e.g.*, *Immanuel v. Comptroller of Maryland*, 449 Md. 76, 82-83 (2016).

The ULC has updated its uniform acts over the years to address new forms of tax-advantaged property. In 1981, it fashioned a rule for IRAs providing that the dormancy period for them would not be triggered until distributions from the account became mandatory. Uniform Unclaimed Property Act § 12(b) (1981).[14] Distributions from IRAs become mandatory only beyond

---

[14] Congress first authorized tax-advantaged IRAs in the Employee Retirement Income Security Act ("ERISA") of 1974, *Mazzei v. Commissioner of Internal Rev.*, 998 F.3d 1041, 1044 (9th Cir. 2021), and first authorized 401(k) defined contribution retirement accounts in 1981,

the typical age for retirement. *See* IRS Pub. 590-B, at 7, 35 (noting that, generally, minimum distributions become mandatory for traditional IRAs by April 1 of the year following the year in which the owner reaches age 72 and do not become mandatory for Roth IRAs until after the owner's death). As such, under the 1981 uniform act, these savings vehicles for retirement could not be presumed abandoned before the typical age for retirement—i.e., the age at which the intended use for the funds would typically arise— not even if the owner left them to grow unattended in the meantime. The uniform laws continue to treat IRAs and other retirement accounts in essentially this fashion, with some added safeguards. RUUPA § 202.[15]

The 2016 uniform act addresses 529 accounts. Stakeholders debated the topic for years before publication, especially with respect to college savings plans. One interest group recommended exempting them entirely. Unclaimed Property Professionals

---

*see* Edward A. Zelinsky, *The Defined Contribution Paradigm*, 114 Yale L. J. 451, 489 (2004). Although individual tax-advantaged retirement accounts apparently did exist in some limited forms before ERISA, *see id.* at 471 (mentioning nonprofit employee accounts), the ULC did not address such accounts in the uniform acts until the 1981 revision, *see* Uniform Unclaimed Property Act § 12(b) (1981).

[15] For employer-sponsored retirement plans such as 401(k) or pension plans, courts have held that ERISA preempts state unclaimed property laws to the extent that they require such plans to transfer assets to the state. *Vega*, 174 F.3d at 873-74; *Manufacturers Life Ins. Co. v. East Bay Rest. & Tavern Ret. Plan*, 57 F. Supp. 2d 921, 924-25 (N.D. Cal. 1999); *see also* U.S. Dep't of Labor, Advisory Opinion 1994-41A, 1994 WL 694828 (Dec. 7, 1994). *But see* RUUPA § 202 cmt (suggesting that these rulings may apply only to employer pension plans, not defined contribution plans such as 401(k) plans). Governmental retirement plans raise different issues because, although employer-sponsored, they are not subject to ERISA. *E.g.*, *Gualandi v. Adams*, 385 F.3d 236, 242 (2d Cir. 2004). Some states appear to use alternative mechanisms, rather than their general systems for unclaimed property, to regulate unclaimed funds in governmental retirement plans. *See* Or. Op. Att'y Gen. No. 6019, 1965 WL 98740, at *1-2 (Sept. 1, 1965) (concluding that Oregon's unclaimed property law did not apply to a state employees' retirement system governed by a more specific statutory mechanism for addressing unclaimed funds in the system); *see also* Samuel Schaunaman et al., *Unclaimed Property and Employee Benefits: What Businesses Need to Know*, 23 J. Multistate Tax'n 30, 32 (2013) (noting that some states allow employee benefit plans to opt out of the abandoned property system by providing in the plan documents for "a method for the treatment of the account balance of the account holder, plan participant, or beneficiary who cannot be located").

Organization, Recommendations to ULC, at 1, 25 (June 18, 2014) ("UPPO Recommendations").  The Investment Company Institute, which represents mutual funds and other investment funds, argued for a thirty-year dormancy period.  National Association of Unclaimed Property Administrators, Recommendations to ULC, at B-3.12 (Oct. 29, 2014) (quoting recommendation).  It considered this period appropriate due to the "nature and purpose of such accounts and the severe tax consequences and penalties that would result from their premature escheatment." *Id*.  Finally, the National Association of Unclaimed Property Administrators, which represents the state agencies that enforce unclaimed property laws, countered that such a long dormancy period would be "arbitrary and [would] unnecessarily delay[] escheatment." *Id*.  It suggested instead a rule under which accounts could not be presumed abandoned before the beneficiary turned 26.  RUUPA Reporter, Compilation of Recommendations and Suggestions for Revision Submitted by Stakeholders, at 23 (undated).

In the end, the ULC mostly followed the proposal of the Investment Company Institute.  For college savings accounts, the 2016 uniform act uses a three-year dormancy period that does not begin to run until thirty years after the account is opened.  RUUPA § 203 cmt.[16]  The ULC explained that it had determined that college savings accounts "may well be used by beneficiaries over a longer period of time and that, as a consequence, a policy allowing for up to thirty years before those accounts would be surrendered to the states was prudent and favored consumers." *Id*.  As for ABLE accounts, the 2016 uniform act exempts them entirely, RUUPA § 203, due to their "nature and purpose," *id.* cmt.[17]

---

[16] The dormancy period may also be triggered when distributions from an account become mandatory under federal tax law, *see* RUUPA § 203(1), but that situation does not apply to 529 accounts. *Compare* 26 U.S.C. § 529(c)(3) (not requiring distributions within any time horizon), *with id*. § 530(b)(1)(E) (generally requiring that Coverdell education savings accounts be fully distributed 30 days after beneficiary turns 30).

[17] Some states have enacted laws that follow these aspects of the uniform act. *See* Uniform Law Comm'n, Map, https://www.uniformlaws .org/committees/community-home?CommunityKey=4b7c796a-f158-47bc-b 5b1-f3f9a6e404fa (last visited Apr. 28, 2023) (showing enactment of the 2016 revised act by ten states and the District of Columbia); *e.g.*, Colo. Rev. Stat. Ann. §§ 38-13-102(24)(c)(I), 38-13-203.  A few other states expressly address unclaimed 529 accounts in statutes that are not based on the uniform act but that typically use similar approaches—essentially, specialized rules under which the presumption of abandonment cannot arise until after the point that a beneficiary would likely have intended to

## C. Maryland's Abandoned Property Act

The General Assembly enacted the Abandoned Property Act in 1966. 1966 Md. Laws, ch. 611.[18] The Act drew heavily from, and remains substantially based upon, the 1954 uniform act. *See PHH Corp.*, 123 Md. App. at 218. The General Assembly has, of course, amended the statute over the years. To list a few examples, it has (over time) shortened the dormancy period that applies to most property types from fifteen years to the now-standard three years. *See* 2002 Md. Laws, ch. 440. It added a subtitle about property in federal custody. 1981 Md. Laws, ch. 752 (adding subtitle 2, CL §§ 17-201 to 17-209). It also joined a minority of states in enacting so-called "business to business" or "B2B" exemptions, so that the Act does not cover many checks, credits, or transactions between businesses. *E.g.*, 1997 Md. Laws, ch. 732; *see* CL § 17-101(m)(2)-(4) (current B2B exemptions); *see generally* RUUPA, Prefatory Note, at 10. And last year, it amended the provisions that govern bank accounts, other property held by financial institutions, and stocks and dividends to provide that such property is not presumed abandoned unless the holder lacks a valid address for the owner. 2022 Md. Laws, ch. 648 (H.B. 305).

But many of the Act's core provisions still hew closely to their analogues from the 1954 uniform act, albeit with updated dormancy periods. *Compare, e.g.*, CL § 17-306 (property held by fiduciaries), § 17-307 (property held by public entities), *with* 1954 Uniform Act §§ 7-8. The Act does not contain provisions addressing retirement accounts, 529 accounts, or other types of tax-advantaged property—although, as discussed later, the Comptroller has issued a regulation on IRAs. COMAR 03.05.01.06; *see infra* Part II.A.5.

---

use the benefits. *E.g.*, La. Rev. Stat. § 9:154A(15)(a) (five-year dormancy period cannot begin until beneficiary's thirty-fifth birthday); Ala. Code §§ 16-33C-7(c), 16-33C-11(a)(10) (presumption of abandonment applies if property still unclaimed upon expiration of benefits period); *cf.* Fl. Stat. Ann. § 1009.972(5) (if prepaid benefits remain unclaimed after expiration of benefits period and an additional dormancy period, they transfer to scholarship programs). We are not aware of any state statutes that explicitly subject 529 plans to generally applicable dormancy periods for non-tax advantaged property.

[18] Until 1981, the Maryland Act had the same title as the uniform laws. *See* 1981 Md. Laws, ch. 752 (amending what is now CL § 17-326 to change the title of the act from the "Uniform Disposition of Unclaimed Property Act" to the "Uniform Disposition of Abandoned Property Act").

Like the laws of some other states, the Act uses the term "abandoned property" in place of "unclaimed property." CL § 17-101(b)(2) (defining "abandoned property" to include property in federal custody that "is classified as 'unclaimed property' under federal law").[19] The Comptroller administers the Act and must initiate the sale of property (other than money) received under it within a year. *Id*. §§ 17-101(c), 17-316(a). The Act directs the Comptroller to distribute the sale proceeds and other monies received under the Act across specified funds in the State Treasury—for example, $8,000,000 to the Maryland Legal Services Corporation Fund; $14,000,000 to the Access to Counsel in Evidence Special Fund in fiscal year 2024—with the remainder going to the General Fund. CL § 17-317(a). The Comptroller must reserve $50,000 to pay claims. *Id*. (a)(1)(ii).

## II
## Analysis

### A. Whether the Abandoned Property Act Applies to 529 Accounts

The principal question here, whether the Abandoned Property Act applies to 529 accounts in the Maryland programs, is one of statutory interpretation that turns upon legislative intent. *E.g.*, *Immanuel*, 449 Md. at 86. The "normal, plain meaning of the language of the statute" is the chief indicator of the General Assembly's intent. *Wheeling v. Selene Finance LP*, 473 Md. 356, 376 (2021). If the statutory language is "clear and unambiguous," the interpretive inquiry generally ends there. *Dejarnette v. State*, 478 Md. 148, 162 (2022); *Immanuel*, 449 Md. at 86. If the statutory language is ambiguous, however, we must consider other indicators of legislative intent, including context, the purpose of the statutes, the consequences of plausible interpretations, and legislative history. *Wheeling*, 473 Md. at 377; *Mayor & Town Council of Oakland v. Mayor & Town Council of Mountain Lake Park*, 392 Md. 301, 316 (2006). The Maryland courts have also explained that "an ambiguity may still exist" in statutory language "even when the words of the statute are themselves 'crystal clear,'" if the statute's "application in a given situation is not clear." *Blind Indus. & Servs. of Maryland v. Maryland Dep't of Gen. Servs.*, 371 Md. 221, 231-32 (2002). In other words, the "intrinsic meaning [of statutory language] may be fairly clear, but its application to a

---

[19] In this opinion, we use "unclaimed property" when referring generally to the field of unclaimed property law and "abandoned property" when referring to the Maryland Act.

particular object or circumstance may be uncertain." *Id*. at 232 (quoting *Gardner v. State*, 344 Md. 642, 649 (1997)).

Before applying these principles, we emphasize that this is a novel question of law. Unclaimed property laws and 529 programs coexist in nearly every state, and the policy question of how they should fit together has prompted much debate. The uniform act's proposed thirty-year trigger period for college savings plans and exemption for ABLE programs emerged from that debate. But we know of no published court decision or administrative determination that analyzes whether an unclaimed property law that has not been updated to address 529 accounts nonetheless applies to them. Some sources indicate that agencies in other states have confronted the issue, *see, e.g.*, UPPO Recommendations at 25 (describing determinations of Ohio and Connecticut agencies that unclaimed property laws do not apply to 529 assets), but we have not found published legal analysis explaining their decisions.[20]

In addressing this question, we are also mindful of this novelty and of our obligation to hew to current State law while leaving resolution of the burgeoning policy issue to the General Assembly. *See* 77 *Opinions of the Attorney General* 188, 190 (1992); 76 *Opinions of the Attorney General* 3, 3 (1991). Ultimately, as we will explain, we do not think the General Assembly intended the Abandoned Property Act to apply to 529 accounts when it enacted the three 529 programs.

We start, as always, with the text of the statute. But, in our opinion, the statutory text here does not resolve the question. To

---

[20] Disclosure documents for 529 programs, including Maryland's programs, often reference unclaimed property laws in general language that does not, in our opinion, convey a clear conclusion about whether the laws apply to the accounts. *See* MCIP Discl. at 29 ("Under certain circumstances, if there has been no activity in your Account and we have not been able to contact you for a period of at least three years, your Account may be considered abandoned under State law."); ABLE Discl. at 43 ("Many states (including Maryland) have unclaimed property laws or similar laws under which if certain statutory requirements are met, funds in an account may be considered abandoned or unclaimed. Your state may request that the Program transfer the funds in your ABLE Account pursuant to such laws."). The ABLE disclosure document does state that impermissible contributions in excess of statutory caps will be treated as abandoned property if not claimed by the contributor. ABLE Discl. at 15. In any event, because your questions concern 529 accounts, we do not address whether these moneys that are prohibited from entering 529 accounts are subject to the Abandoned Property Act.

be sure, several provisions of the Abandoned Property Act are worded broadly enough to implicate college and disability savings plans. Perhaps the most relevant provision is CL § 17-306, which concerns property held by fiduciaries:

> All intangible personal property and any income or increment on it, held in a fiduciary capacity for the benefit of another person, is presumed abandoned unless, within 3 years after it becomes payable or distributable, the owner has increased or decreased the principal, accepted payment of principal or income, corresponded in writing concerning the property, or otherwise indicated an interest as evidenced by a memorandum on file with the fiduciary.

Investment accounts such as 529 accounts constitute "intangible personal property" for purposes of the Abandoned Property Act. *See* 1954 Uniform Act § 9 cmt. (explaining that "a wide variety of items will be embraced under" a section applicable to intangible personal property, including "money, stocks, bonds, certificates of membership in corporations, securities, bills of exchange, deposits, interest, dividends, income"). At first blush, then, it appears plausible that this provision governs 529 accounts. The accounts are, after all, "intangible personal property . . . held in a fiduciary capacity" by the 529 Board for the benefit of account holders and beneficiaries. CL § 17-306. Indeed, given that the fiduciary nature of the Board's oversight anchors the 529 programs, § 17-306 speaks to an essential feature of 529 accounts. *See* Educ. § 18-1907(a) (labelling Board members as "fiduciaries"); *supra* Part I.A (discussing fiduciary aspects of programs).

At least two other provisions of the Act are also worded broadly enough to arguably apply to 529 accounts. Section 17-307 covers all intangible personal property held by public entities:

> All intangible personal property held for the owner by any court, public corporation, public authority, or public officer of this State or any political subdivision of it that has remained unclaimed by the owner for more than 3 years is presumed abandoned.

CL § 17-307.  Even more broadly, the so-called "omnibus section" of the Act purports to cover all types of intangible personal property not covered by other sections:

> All intangible personal property, not otherwise covered by this title, including any income or increment on it and deducting any lawful charges, that is held or owing in the ordinary course of the holder's business and has remained unclaimed by the owner for more than 3 years after it became payable or distributable, is presumed abandoned.

CL § 17-308(b); 1954 Uniform Act § 9 cmt. (explaining that the omnibus section aims to cover "all other intangible personal property not otherwise covered by the more specific provisions of the Act"); *see also* CL § 17-101(*i*), (l) (defining "holder" to include a "person" and defining "person" to include the State and its units). Again, because 529 accounts constitute intangible personal property, it appears plausible, on an initial read, that one of these provisions could apply to the accounts.[21]

Despite their wide sweep, however, these provisions become ambiguous when applied to the unique features of 529 accounts. *See Blind Indus. & Servs. of Maryland*, 371 Md. at 231-32.  As the Court of Appeals—now called the Supreme Court of Maryland— explained in a case concerning the interplay between the Abandoned Property Act and the Public Information Act, statutory language that appears clear on its face may become ambiguous when read in conjunction with another statutory scheme, especially when, as here, the relationship between the statutes is not "plainly set out" in the text and where the acts do not "refer[] directly to each other."  *Immanuel*, 449 Md. at 87; *see also* 107 *Opinions of the Attorney General* 74, 86-87 (2022) (concluding that statutory language that appeared clear in isolation became ambiguous upon consideration of how it would interact with other laws governing the same subject).

---

[21] The broad wording of the Act's fiduciary, public entities, and omnibus provisions is a hallmark of unclaimed property laws.  It is common for one type of property to fall within the potential sweep of various provisions.  *See, e.g.*, *Cory v. Public Utilities Comm'n*, 33 Cal. 3d 522, 526 (1983) (unclaimed telephone refunds could fall under either of two provisions); *Weisman v. Brunetti*, 15 N.J. Tax 197, 200-01 (N.J. App. 1995) (per curiam) (multiple provisions "possibly could apply" to unclaimed rent refunds); *In re Northeast Utilities*, 479 F. Supp. 194, 198 (D. Conn. 1979) (similar for unclaimed shares in public utility).

Indeed, our Office has also recognized that seemingly clear language on the face of the Abandoned Property Act may require additional scrutiny to resolve tensions with other statutes. More specifically, in examining a question about unclaimed lottery prizes, we quoted broad language in the Act that would have appeared, on its face, to cover them. *See* Md. Op. Att'y Gen. No. 86-026, 1986 WL 289921, at *2 (Apr. 9, 1986) (unpublished). Yet we ultimately concluded that the Act did not apply to unclaimed prizes because a section of the State Government Article provided that the State Lottery Agency should retain them to fund future prizes. *Id*. To require the transfer of unclaimed lottery prizes to the Comptroller under the Abandoned Property Act, we reasoned, would have "utterly defeat[ed]" the more specific mandate in the State Government Article. *Id*. at *2 n.4. In short, even when language of the Abandoned Property Act may appear in isolation to subject a particular type of property to its mandates, the ambiguities that arise in application and in reading the Act together with other statutes often require additional scrutiny. *See* 107 *Opinions of the Attorney General* at 86-87.

Here, there are at least three significant ambiguities that arise when attempting to read the Abandoned Property Act in conjunction with the statutes governing the 529 programs. First, the Act's provisions do not fit comfortably with the distinction drawn in the college savings plans between account holders and beneficiaries. Under the plain language of the Abandoned Property Act, a Prepaid Trust or Investment Plan account's *owner*—that is, the person whose actions with respect to the account suffice to forestall dormancy and, ultimately, a presumption of abandonment—would be the account's beneficiary. CL § 17-101(k) ("'Owner' means . . . [i]n the case of a trust, a beneficiary . . . ."). But, as we have seen, the beneficiary does not interface with Maryland 529 or control the account; the account holder does. *See In re Olchowski*, 485 Mass. 807, 816-17 (2020) (reasoning that application of Massachusetts abandoned property law to attorney trust accounts would "be the legal equivalent of trying to fit a square peg into a round hole," in part because the statute would appear to treat the attorney rather than the client as the "owner" of deposits).

One might seek an interpretive solution to this problem by resorting to less specific language in the Abandoned Property Act's definition of owner that points toward the account holder instead of the beneficiary. *See* CL § 17-101(k)(5) (defining "owner" to include "[a]ny person who has a legal or equitable interest in property subject to this title"). *But see State v. Ghajari*, 346 Md.

101, 116 (1997) (the specific prevails over the general in statutory interpretation). Still, the poor fit is apparent. None of the provisions of the Act that might govern 529 accounts speaks to the distinction between account holders and beneficiaries. In contrast, other provisions of the Act do acknowledge special layers of ownership interests in specific types of intangible property, *see, e.g.*, CL § 17-302(b) (addressing the situation where "a person other than the insured or annuitant is entitled to the funds" on an insurance or annuity contract), and the unclaimed property laws of other states that have been updated to apply to 529 accounts specifically address the distinction between account holders and beneficiaries, *see, e.g.*, Ala. Code § 16-33C-7(c);[22] *see also* RUUPA § 102 cmt. (clarifying that "for bank accounts, brokerage accounts, IRAs, and other similar property, the legal owner of the account would take precedence over a named beneficiary who does not yet have legal ownership of the account").

Second, the text of the Abandoned Property Act provisions does not map logically onto the tax-advantaged framework of the three 529 programs, which allows funds to be used without penalty only for education or disability expenses. Under the Abandoned Property Act provisions that might arguably apply to 529 accounts, intangible property is presumed abandoned if the owner takes no action for three years with respect to funds that are available to him or her. For example, the public entities provision states that intangible property is presumed abandoned if it is "held for the owner" by a public entity and "has remained unclaimed by the owner for more than 3 years." CL § 17-307. Similarly, under the fiduciary and omnibus provisions, the presumption of abandonment applies when the owner leaves property unattended for three years after it becomes "payable or distributable." CL §§ 17-306, 17-308(b); *see also* § 17-308(c) ("Property is payable or distributable for the purpose of this title notwithstanding the owner's failure to make demand or to present any instrument or document required to receive payment.").

---

[22] The statute reads: "A [prepaid] contract shall also specifically provide that, if after ten years following the *designated beneficiary's* college entrance date or the actual entrance date of a designated beneficiary who is an accelerated student, neither the [prepaid] contract has been terminated nor the *designated beneficiary's* rights under the contract exercised, the [] board, after making reasonable effort to locate the *purchaser*, shall presume the contract purchase amount unclaimed and abandoned property, and thereafter administered in accordance with the Alabama Uniform Disposition of Unclaimed Property Act . . . ." Ala. Code § 16-33C-7(c) (emphases added).

These provisions are in tension with the nature of 529 account distributions, which the account owner may initiate at any time but which will be subject to tax penalties if the funds are not put toward a qualifying education or disability expense. For example, if we were to apply the fiduciary provision—which, on its face at least, is perhaps the most likely to apply in this context—529 accounts would appear to be "distributable" from the moment the account owner places funds in them, because the 529 statutes allow the account holder to initiate a "distribution" at any time. *See Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/distributable (last visited Sept. 23, 2022) (defining "distributable" to mean "capable of being distributed"); *supra* Part I.A (discussing 529 distribution rules).[23] Yet unless the account holder has already accrued qualifying expenses to apply the funds against (i.e., unless the beneficiary has enrolled in a qualifying school or accumulated disability expenses), generally the distribution will be penalized.

In short, the text of the Act, read in isolation, would appear to treat funds in 529 accounts as available to the account holder, and thus subject to the generally applicable three-year dormancy period, even when distribution of the funds would trigger tax penalties. Whereas RUUPA and the unclaimed property laws of many other states address this problem, the Maryland Act does not. *See* RUUPA § 203 (dormancy period for 529 and other tax-advantaged accounts begins to run thirty years after the account is opened or "the date, if determinable by the holder" when distributions become mandatory, whichever is earlier).

Third, the provisions of the 529 enabling statutes that seek to protect 529 funds from the State add further ambiguity. As mentioned earlier, each of the three enabling statutes contains a provision that states as follows: "Money of the [program] may not be considered money of the State and may not be deposited" into the State Treasury. *E.g.*, Educ. § 18-1903(f). Because the Abandoned Property Act requires the Comptroller to liquidate presumptively abandoned property and deposit the sale proceeds into specified Treasury accounts within one year of receipt, CL §§ 17-316, 17-317, there is again some tension between the Act's requirements and the 529 statutes.

---

[23] As discussed later, we have considered whether the phrase "payable or distributable" might reasonably be interpreted to trigger the dormancy period for 529 accounts only after some threshold event, such as if the account is terminated. We do not think so. *See infra* Part II.B.5.

To be sure, the language in the 529 statutes does not explicitly exempt the accounts from the Abandoned Property Act, *cf.* Educ. § 18-1911 (exempting Prepaid Trust from the Insurance Article), nor create a conflicting mechanism for dealing with unclaimed accounts, *cf.* Md. Op. Att'y Gen. No. 86-026, 1986 WL 289921, at *2 n.4. And even though the Comptroller deposits sale proceeds into the State Treasury, the Comptroller has a custodial responsibility to safeguard and return the value of presumptively abandoned property to the owner upon demand. CL §§ 17-313, 17-319. Still, the care that the enabling statutes take in seeking to wall off 529 funds from the State Treasury reinforces the ambiguity about whether the Legislature intended the Abandoned Property Act to apply. *See Immanuel*, 449 Md. at 87 (finding the text of the Abandoned Property Act ambiguous where it and another relevant statute did "not plainly set out" their interplay and where "[n]either of the acts refer[ed] directly to the other").

Having found no "clear and unambiguous" answer in the statutory text, we consider the surrounding context, the consequences of potential interpretations, the purpose of the relevant statutes, and the legislative history to determine whether the General Assembly intended the Abandoned Property Act to apply to 529 accounts. *See Mayor & Town Council of Oakland*, 392 Md. at 316. These considerations, in our view, establish that the General Assembly did not so intend.

    *1.    Context*

Beginning with context, the Act's three-year dormancy period does not match the nature of the 529 programs. The tax advantages of the programs—in particular the possibility of tax-free earnings—incentivize (although do not require) people to invest money far in advance of expected education and disability expenses. *See supra* Part I.A. The programs also allow for extended gaps between initial investment and benefits use. Prepaid Trust accounts are available at birth, and the benefits period extends until at least ten years after the beneficiary's projected college enrollment date. MPCT Discl. at 10, 25. ABLE accounts are available at birth and are designed for people who by age 26 have disabilities or blindness; distributions, meanwhile, may be used for qualifying expenses even after the beneficiary's death. ABLE Discl. at 3, 7. And Investment Plan accounts are available even before a child's birth—apparently by way of parents who name themselves as initial beneficiaries before the birth. Maryland 529, New and Expectant Parents, https://maryland529.com/529-Basics/For-Every-Saver/New-and-Expectant-Parents (last visited

May 2, 2023). The funds then remain available for education expenses anytime during the child's life and can be transferred to relatives even after that. MCIP Discl. at 27-28.

In sum, the framework of each 529 program—the tax advantages and the extended lifecycles for accounts—encourages people to invest early to cover expenses that may not arise for decades. This framework clashes with the three-year dormancy period in the relevant provisions of the Abandoned Property Act. Under any of the provisions that might apply to 529 accounts, Maryland 529 would be required to transfer the accounts to the Comptroller after three years of inactivity if unable to contact the owners.[24] This inconsistency, in our view, suggests that the General Assembly did not intend the Abandoned Property Act to apply to the accounts. *See Blind Indus. & Servs. of Maryland*, 371 Md. at 236 (declining to give an ambiguous statute an interpretation that would have "an adverse impact on the goals of" another statute).

Granted, the tension between the nature of the 529 accounts and the Abandoned Property Act does not amount to the type of blatant statutory conflict that led us to conclude, in a prior opinion, that the Act does not apply to lottery winnings. *See* Md. Op. Att'y Gen. No. 86-026, 1986 WL 289921, at *2 n.4. Yet when legislatures in other jurisdictions have intended unclaimed property laws to apply to 529 accounts, they have tailored much longer dormancy periods—typically, thirty years—to fit the long-term nature of the accounts and thus avoid the clash that application of the Maryland Act to 529 accounts would entail. *See, e.g.*, Colo.

---

[24] As already mentioned, unclaimed property laws generally require the holder to attempt to notify the owner before transferring property to an unclaimed property fund. *See supra* Part I.B. Under the provisions of the Maryland Act that might apply to 529 accounts, the required notice must be by first-class mail. CL § 17-308.2. This notice requirement, while integral to the statutory scheme, is not a failsafe. *See Hearing on H.B. 882 Before the House Economic Matters Comm.*, 2020 Leg., Reg. Sess., at 1-2 (Mar. 6, 2020) (written testimony of Del. Kerr, bill sponsor, discussing instances where notice failed to prevent the transfer of financial accounts that owners intended to leave undisturbed); *see also* 2022 Md. Laws, ch. 648 (H.B. 305) (addressing notice concerns by amending the Abandoned Property Act provisions for banks and financial organizations to provide that the dormancy period does not begin unless the holder lacks a valid address for the owner); RUUPA §§ 203, 501 (imposing notice-by-mail requirement but still using a special 30-year trigger period for tax-advantaged college savings accounts).

Rev. Stat. Ann. § 38-13-203 (following RUUPA 30-year dormancy period).

### 2. Consequences

Application of the Abandoned Property Act to 529 accounts would also have illogical consequences. Although property owners may claim their abandoned property from the Comptroller at any time, CL § 17-318, a 529 account holder who recovers funds from the Comptroller following a transfer under the Act would often owe income taxes and penalties on the earnings portion of the account, 26 U.S.C. § 529(c)(3)(A) (rendering distributions from college savings plans for non-qualified expenses taxable unless an exception applies); *id.* § 529A(c)(1)(A) (same for ABLE); *cf*. IRS Rev. Rul. 18-17, 2018-25 I.R.B. 753 (treating transfers of IRA assets to unclaimed property funds as "distributions" for purposes of Internal Revenue Code reporting and withholding requirements); IRS Rev. Rul. 20-24, 2020-45 I.R.B. 965 (similar analysis for transfers from qualified retirement plans under 26 U.S.C. § 401(a)).

Account holders could avoid these negative tax consequences only in narrow circumstances. For example, if by coincidence the beneficiary happened to have qualifying education or disability expenses in the relevant tax year, the account holder could count those expenses against the recovered funds. *See* 26 U.S.C. § 529(c)(3)(B)(ii). Or, in the unlikely event that the account holder recovers the funds within sixty days of the transfer to the Comptroller, he or she could roll them over into a new 529 account without suffering tax consequences. *Id*. § 529(c)(3)(C)(i).[25]

---

[25] In the case of retirement accounts, the IRS has issued guidance permitting waivers of the sixty-day rollover deadline for funds that have been distributed to a state unclaimed property administrator. IRS Rev. Proc. 20-46, 2020-45 I.R.B. 995. The IRS has not made the same type of waiver available for 529 accounts, and it is not clear that the IRS would have authority to do so. *Compare* 26 U.S.C. § 408(d)(3)(I) (authorizing the IRS to waive the deadline for individual retirement accounts where the failure to do so "would be against equity or good conscience"), *with id*. § 529(c)(3)(C)(i) (no waiver language for college savings accounts), and § 529A(c) (same for ABLE accounts). But even if the IRS were to authorize such a waiver in the future, the point would remain that, under the tax laws as they existed when the General Assembly created each of the 529 programs, application of the Abandoned Property Act would have triggered illogical tax consequences and would thus have constituted a result that the General

Otherwise, account holders or their beneficiaries would be left to pay taxes and penalties on earnings from an account that they set up specifically because its earnings were meant to be tax-free. *See id.* § 529(c)(3).

In addition, funds remaining after the tax bill could not be restored to their original tax advantages, at least not fully. The account would not enjoy tax-free appreciation during its period in the Comptroller's custody. And given that rollovers are unavailable after 60 days, an account holder wishing to return the funds to a 529 program would face obstacles—either a second round of gift tax implications in the case of a college savings program, or the strict annual cap on contributions (currently $17,000, plus some income) that applies to ABLE.

The upshot is that, on top of the taxes and penalties on account earnings, the transfer of a 529 account to the Comptroller would in many cases cause irreparable damage to an account's tax advantages going forward. The prospect of such illogical consequences again suggests, in our view, that the General Assembly did not intend the Abandoned Property Act to apply. It is "inconsistent with common sense," *State v. Fabritz*, 276 Md. 416, 422 (1975), that someone who frontloads an account and leaves it alone for years before the time for its intended use arises— exactly the type of behavior that the 529 programs incentivize— could face taxes, penalties, and the loss of the core tax advantages of the account.

### 3.   *Legislative Purpose*

The legislative purpose of the Abandoned Property Act and of the 529 enabling statutes further supports the conclusion that the Act does not apply to 529 accounts. Recall that unclaimed property laws like Maryland's have two main purposes: to protect owners' interests by reuniting them with their unclaimed property, and, failing that, to ensure that the benefit of unclaimed property runs to the State rather than private actors. *See supra* Part I.B. Of these two purposes, the first is paramount. *See Cerajeski*, 735 F.3d at 583 ("[U]nclaimed property acts are primarily designed not to enrich the state directly but to return the unclaimed property to the stream of commerce, and to protect property owners against what's

---

Assembly probably did not intend. *Wheeling*, 473 Md. at 376 (ultimate goal of statutory interpretation is to "ascertain and effectuate the General Assembly's purpose and intent *when it enacted the statute*" (emphasis added)).

known as lucrative silence.") (cleaned up); *Patronis v. United Ins. Co. of America*, 299 So.3d 1152, 1157 (Fl. Dist. Ct. App. 2020) ("[U]nclaimed property laws are inherently remedial in nature and generally understood as advancing a state's strong interest in protecting consumers . . . . Their raison d'être is principally to safeguard the economic rights of consumers . . . ."). Thus, unclaimed property laws must be interpreted to advance the interests of consumers before the interests of the government. *Patronis*, 299 So.3d at 1158; *see* 1954 Uniform Act, Prefatory Note, at 2 (listing the protection of property owner interests as the first policy purpose).

Given that the administrators of state unclaimed property funds have unmatched expertise in reuniting owners and property, broad construction and application of unclaimed property laws usually comports with their paramount purpose of protecting consumers. *See Clymer*, 171 N.J. at 67 (reasoning that unclaimed property laws should be "given a liberal interpretation in favor of the State"); *Patronis*, 299 So.3d at 1158 ("[T]he state is deemed the preferred custodian of escheatable funds (versus private companies) . . . ."); U.S. Gov't Accountability Office, Report 19-88, *Retirement Accounts: Federal Action Needed to Clarify Tax Treatment of Unclaimed 401(k) Plan Savings Transferred to States*, at 17 (Jan. 2019) ("*GAO Unclaimed 401(k) Report*") (data showing that unclaimed property administrators have considerable success reuniting owners with retirement savings). But not in the case of 529 accounts under the Maryland Act. Interpreting the Act's generally applicable three-year dormancy period to govern these tax-advantaged accounts would, as we have seen, disrupt long-term savings plans and trigger negative tax consequences even for people using the accounts exactly as intended. In other words, application of the Act would not favor consumer interests and thus would not align with the Act's primary purpose.

The purpose of the 529 enabling statutes reinforces the point. Unlike the Abandoned Property Act, the enabling statutes coalesce around a single purpose: to make education and disability expenses more affordable by providing for prepayment or tax-advantaged savings. Each of the three statutes articulates this purpose explicitly. Educ. § 18-1902 (Prepaid Trust seeks to "enhance the accessibility and affordability of higher education"); § 18-19A-02(b) (purpose of Investment Plan is to "allow contributions to an investment account established for the purposes of meeting [] qualified higher education expenses"); § 18-19C-02(b)(1) (purpose of ABLE program is to "[e]ncourage and assist individuals and families in saving private funds to support individuals with

disabilities" and "[p]rovide secure funding for disability-related expenses").

The statutes guard this purpose in various ways: by imposing fiduciary obligations on the Board and agency employees, § 18-1907; prohibiting distributions except at the account holder's request, *see infra* Part II.B.1; and, of course, walling off the programs' funds from the State Treasury, *e.g.*, Educ. § 18-19A-05(c). In other words, the statutes aim not merely to help people meet the challenge of paying for education and disability expenses, but also to safeguard this objective by ensuring that nobody but the account holder may divert account funds to any other purpose. We think it implausible that the General Assembly intended accounts in programs created with such a unitary focus on long-term savings for onerous expenses to be subject to a three-year dormancy period capable of triggering a presumption of abandonment (with resulting tax losses and impairments to the savings vehicle) long before some account holders might reasonably intend to use funds. *See Blind Indus. & Servs. of Maryland*, 371 Md. at 236 (declining to interpret a statute in a manner that would produce consequences in such "clear contradiction" of the spirit of the statute as to make it "inconceivable that that could have been the Legislature's intent").

### 4. *Legislative History*

Finally, the legislative history aligns with the view that the Legislature did not intend the Abandoned Property Act to apply to 529 accounts. Although we have not identified any materials in the legislative history that address this question directly, the history confirms the General Assembly's preoccupation with protecting 529 investments from diversion to other State uses. At the request of a delegate, the Governor's office proposed adding the prohibition on Treasury deposits to the Prepaid Trust bill (the first of the 529 enabling statutes) to "make it clear that the monies of the program cannot be captured by the State." Hoffman Letter. The bill already contained language relevant to this concern—it required the Board to manage assets "solely for purposes of" the program and not to "use the assets for any other purpose of the State." S.B. 232, 1997 Leg., Reg. Sess. (First Reader). But the General Assembly still adopted the amendment, 1997 Md. Laws, ch. 110, and later included the same prohibition in the enabling statutes for MCIP in 2000 and for ABLE in 2016. 2016 Md. Laws, ch. 39; 2000 Md. Laws, ch. 494. In a similar vein, the General Assembly built out the fiduciary provisions in the Prepaid Trust bill: after the bill was introduced, the Senate added the language

that eventually became Educ. § 18-1907, imposing fiduciary obligations on the Board and program employees, Amend. No. 889800/1, S.B. 232, 1997 Leg., Reg. Sess., at 5-7 (Senate Budget and Taxation Comm.), and the House later supplemented these amendments with bonding requirements for the program fiduciaries, Amend. No. 084835/1, S.B. 232, 1997 Leg., Reg. Sess., at 2-3 (House Appropriations Comm.).

All of these amendments evinced the same legislative concern as the bills wound their way through the two chambers: everyone wanted to reinforce that the Board and its employees must act for the benefit of account holders and beneficiaries, and that the State must not divert 529 investments to other uses. Although none of the resulting statutory language speaks to unclaimed property issues and we do not think that this history by itself would be conclusive, the concern conveyed in the legislative history with ensuring that 529 investments would not slip away to unintended uses comports with the conclusion we draw from context, consequences, and legislative purpose: the General Assembly probably did not intend to require 529 accounts to transfer to the Comptroller, incur tax losses, and lose tax advantages under the application of a three-year dormancy period.

### 5. Other Considerations

In reaching this conclusion, we have considered whether the Act might reasonably be interpreted to apply to 529 accounts only at a stage that would fit more appropriately with their nature as tax-advantaged, long-term savings plans—for example, in the case of a college savings plan, after the beneficiary reaches a typical age for enrolling in college. *See Immanuel*, 449 Md. at 87 ("[I]f two acts can reasonably be construed together, so as to give effect to both, such a construction is preferred, and the two should be construed together to be interpreted consistently with their general objectives and scope.").

For some retirement accounts established pursuant to 26 U.S.C. § 401(a) and 26 U.S.C. § 408(a), including but not limited to IRAs and IRA-based Self-Employed Retirement Accounts (known as "Keogh" accounts), the Comptroller has fashioned such a harmonizing rule by regulation. COMAR 03.05.01.06. The regulation mimics the rule for IRAs from the 1981 uniform law: under it, such accounts may not be presumed abandoned until they reach the stage that distributions from them become mandatory, which means after retirement age. *Id*.; *see supra* Part I.B (discussing 1981 uniform act). As such, transfers under the

regulation do not disrupt retirement savings plans prematurely and do not trigger negative tax consequences. Neither the regulation nor its history indicates which provision of the Abandoned Property Act the Comptroller determined applied to the retirement accounts. But given the regulation's focus on mandatory *distributions*, we assume it rests upon an interpretation of the term "distributable" in the fiduciary section. *See* CL § 17-306 (presumption of abandonment arises "3 years after [property] becomes payable or distributable"); *see also* Uniform Unclaimed Property Act § 12(b) (1981) (adding IRA rule to the fiduciary provision).

In our view, however, the Act does not leave room for an analogous interpretation with respect to 529 accounts. Unlike tax-advantaged retirement accounts, 529 accounts do not have withdrawal deadlines. There are no required minimum distributions. *See* 26 U.S.C. §§ 529(c)(3), 529A(c)(1). Even where an account reaches some threshold event—such as the death of the beneficiary, or the expiration of the benefits period for a Prepaid Trust account (ten years beyond the projected enrollment date, plus the number of tuition years purchased)—generally the funds may be rolled over into another program or transferred to another beneficiary and retain their tax advantages. *See* MPCT Discl. at 12-13. The tax advantages do not expire as they do in the retirement context. So we cannot harmonize the 529 programs with the Abandoned Property Act by concluding that the Act applies only at the juncture that an account must be drawn down, because for 529 accounts there is no such juncture. Nor would it be plausible to interpret the Act to apply only at the point that account holders may withdrawal funds without penalty for qualifying expenses of the beneficiary: unlike retirement account custodians, who know when the owner reaches the age at which tax-advantaged funds become available without penalty, Maryland 529 does not know when an account beneficiary enrolls in a qualifying educational institution or incurs qualifying disability expenses.

Of course, the Legislature might conclude for policy reasons that the expiration of the benefits period for a Prepaid Trust account, or some other event for accounts in any of the 529 programs, should trigger a dormancy period under the Act. *See* Ala. Code § 16-33C-7(c) (providing that presumption of abandonment applies to unclaimed prepaid accounts ten years after the beneficiary's college entrance date); *supra* note 17 (discussing other states' bespoke statutory solutions for applying unclaimed property laws to 529 accounts). But, in our view, the statute in its current form cannot reasonably be interpreted to mandate such a

tailor-made approach to 529 accounts. *Compare* CL §§ 17-306, 17-307, 17-308(b) (providing for three-year dormancy periods generally triggered by the availability of funds to the owner), *with* RUUPA § 203 (fashioning a unique thirty-year dormancy trigger for 529 accounts).

We recognize that our view of the Abandoned Property Act's inapplicability to 529 accounts may have policy drawbacks. Like any type of financial account, some participants will inevitably forget about their 529 accounts and leave them unclaimed. *See GAO Unclaimed 401(k) Report*, Summary (noting that $35 million in unclaimed retirement savings was transferred to states in 2016). If the Act is inapplicable, the Comptroller's expertise in reuniting such funds with their owners will not come to bear. Moreover, if these funds remain unclaimed, the financial windfall that they represent will not transfer to the State and will not flow to the purposes that the General Assembly has designated for unclaimed property.[26]

We reiterate, as we have on prior occasions when called upon to interpret the Abandoned Property Act, that "[o]ur conclusion about current law is not intended to address the[se] underlying policy issue[s]." 77 *Opinions of the Attorney General* at 190. Maryland, unlike some other states, has not enacted a statute that speaks to how to balance the long-term, tax-advantaged nature of 529 accounts against the benefits of regulating unclaimed property. Our view of current law, as we have explained, is that the General Assembly did not intend the Act to govern, because application of its three-year dormancy period to long-term 529 accounts would clash with the context and purpose of the 529 enabling statutes and would trigger tax losses and other consequences that defy common sense.

---

[26] As we understand the 529 programs' finances, the financial windfall of abandoned Prepaid Trust accounts will go to other account holders, because the funds will maintain the corpus of the trust that ultimately goes to pay out defined benefits. *See Vega*, 174 F.3d at 872 (explaining that unclaimed funds in a defined benefit retirement plan would be available to pay out benefits to other participants if not subject to unclaimed property laws). In the case of MCIP and ABLE, for which Maryland 529 and outside administrators split fees, some of the financial windfall will remain with Maryland 529 and some will go to the outside administrators.

### B.   Other Unclaimed Property Issues

The conclusion that the Abandoned Property Act does not apply to 529 accounts makes it unnecessary to address your agency's second question, which seeks guidance on how to apply the Act's requirements to the accounts.  But the Maryland Act and the unclaimed property laws of other states still impose some requirements on Maryland 529.  For clarity and completeness, we address these requirements below.

### 1.   Uncashed Distribution Checks

Your agency's opinion request does not mention uncashed distribution checks, but we understand that Maryland 529's questions about complying with the Act arise in part from issues related to them.  *See* Office of Legislative Audits, Maryland 529 Audit Report at 21-22 (Dec. 2019) ("2019 OLA Audit Report") (noting "uncashed checks totaling approximately $1.7 million that were more than three years old").  Whether the Act applies to these uncashed checks is less clear than whether it applies to the 529 accounts.  But, although not entirely clear, it is our view that, even though the Act does not apply to 529 accounts themselves, it likely *does* apply to sums payable on distribution checks that your agency issues (or, perhaps more accurately, that are issued on your agency's behalf) that draw against 529 account balances.[27]

As an initial matter, sums payable on outstanding checks are clearly "intangible personal property" of the check's payee within the meaning of unclaimed property laws.  *E.g.*, *Division of Unclaimed Prop. v. McKay Dee Credit Union*, 958 P.2d 234, 237 n.4 (Utah 1998); *Revenue Cabinet v. Blue Cross & Blue Shield of Kentucky, Inc.*, 702 S.W.2d 433, 434-35 (Ky. 1986).  A check is evidence of the payee's right to be paid a specified amount.  *Blue*

---

[27] It is our understanding that, although Maryland 529 formerly issued some distribution checks in-house, *id*. at 16, outside program managers now manage the issuance of all distribution checks on its behalf. Sample distribution checks that we have reviewed make clear that Maryland 529—and not the outside program manager—is liable for the sums payable on the checks.  As such, Maryland 529 is the "holder" of the sums payable on the checks for purposes of the Act, notwithstanding the involvement of the outside manager.  *See* CL § 17-101(*i*)(3).  Our analysis here of Maryland 529 checks therefore encompasses checks that the outside program managers issue on Maryland 529's behalf.  In the event that an outside program manager is directly liable on any distribution checks, such checks would also likely be subject to the Act, albeit under a different analysis.  *See infra* note 30.

*Cross of N. Cal. v. Cory*, 120 Cal. App. 3d 723, 736 (1981). This right to be paid, referred to as a "chose in action" in the early uniform acts, is what constitutes intangible property. *Id*. at 735-36; 1954 Uniform Act § 1(f) (defining "owner" to be the "creditor, claimant, or payee" in the case of "other choses in action" aside from deposits and trusts); *see Chose*, *Black's Law Dictionary* (11th ed. 2019) (defining "chose in action," in relevant part, as "[a] proprietary right in personam, such as a debt owed by another person").

To be clear, the check itself is not intangible property; it is only a "piece[] of paper" that documents the underlying right to be paid. *Revenue Cabinet*, 702 S.W.2d at 434; *accord Cory*, 120 Cal. App. 3d at 736. Thus, where the sum reflected on an outstanding check is no longer payable—because, for example, the payee has accepted payment through a different instrument or reversed the original payment instructions—the sum is not intangible property and is not subject to a presumption of abandonment. *See Revenue Cabinet*, 702 S.W.2d at 436 ("The issue is whether [the payor] is obliged to honor the debt which the checks represent."); *cf.* RUUPA § 1005(c) (providing that a payor may demonstrate that a check was "replaced with another instrument," "paid, satisfied, or discharged," "issued in error," or prove other facts to overcome the presumption that the check records an undischarged obligation). Similarly, in the unusual circumstance where the check does not represent a payment obligation to begin with—e.g., if the check represents a settlement offer—there is no right to be paid and the underlying sum is not intangible property. *Revenue Cabinet*, 702 S.W.2d at 735-36; *cf.* RUUPA § 1005(c)(1). In short, a check is evidence of a right to be paid that constitutes intangible property, but the evidence is rebuttable.

The Maryland Act tracks this treatment of sums payable on uncashed checks, albeit with one exception for checks issued between businesses. The Act follows the language of the 1954 Uniform Act in specifying that the "creditor, claimant, or payee" is the "owner" of a "chose[] in action." CL § 17-101(k)(3). The Act does not define the terms "intangible personal property" or "personal property" directly, but it does specify that certain items do *not* constitute "personal property." *Id*. § 17-101(m). Among these excluded items are "[o]utstanding checks or credits issued to vendors or commercial customers in the ordinary course of business," *id*. § 17-101(m)(3), an exclusion that the General Assembly enacted in 1998 as part of a package of "business-to-business" exceptions, 1998 Md. Laws, ch. 663; *see Siemens USA Holdings, Inc. v. Geisenberger*, 17 F.4th 393, 417 n.32 (3d Cir.

2021) ("[B]usiness-to-business transactions and gift certificates are exempt from several states' escheatment laws."). If sums payable on checks were not ordinarily "intangible property" under the Act, that exclusion would not have been necessary. In light of these provisions, then, sums payable on uncashed checks constitute "intangible personal property" under the Act, unless the checks fall within the business-to-business exception. *See* CL § 17-101(k)(3), (m).[28]

Once the term "intangible personal property" is understood to generally include sums payable on uncashed checks, one can easily

---

[28] We do not think that the business-to-business exception is likely to apply here. First of all, government agencies such as Maryland 529 might not even fall within the scope of the exception, which appears aimed at transactions between private businesses. *See Siemens USA Holdings, Inc.*, 17 F.4th at 417 n.32 (noting that the exception is for "business-to-business transactions"); Bill File on H.B. 48, 1998 Leg., Reg. Sess., Economic Matters Comm., Bill Analysis at 2 (explaining that the bill sought to align the Act with the fact that "[c]redit balances between businesses are often resolved in ways that are not reflected in the businesses['] accounting records" and providing an example of an uncashed check for the supply of goods between private businesses). But as we do not have complete information about the range of checks that Maryland 529 issues or its business relationships, we hesitate to decide whether the business-to-business exception could ever exempt a Maryland 529 check from the Act. Rather, in responding to the question about 529 accounts, we conclude only that the variety of checks of which we are aware that draw against 529 account balances—namely, distribution checks sent to account holders, beneficiaries, and educational institutions, *see* 2019 OLA Audit Report at 15, 21—do not fall within the exception. As for those checks, the "business-to-business" exemption applies only to "[o]utstanding checks or credits issued to vendors or commercial customers in the ordinary course of business." CL § 17-101(m)(3). Account holders, beneficiaries, and educational institutions do not fit within the plain meaning of the term "vendors or commercial customers" in these circumstances, especially when that language is understood in the context of the underlying legislative purpose to exempt sums payable on checks issued between businesses in high-volume commercial relationships. *See* § 17-101(m)(3); Bill File on H.B. 48, 1998 Leg., Reg. Sess., Economic Matters Comm., Bill Analysis at 2. Thus, CL § 17-101(m)(3) does not exempt these checks from the reach of the Act. (To be clear, we do not mean to say that an educational institution could never be the "vendor or commercial customer" of a private business, only that an educational institution receiving a tuition payment from a student or parent—or from a savings plan that distributes tuition payments on their behalf—is not a "vendor or commercial customer" with respect to such persons or entities.)

see based on the statutory text how the Act might apply to sums payable on uncashed distribution checks issued by Maryland 529. Regardless of whether Maryland 529 is considered, for purposes of the Act, to be a fiduciary governed by CL § 17-306, a public entity governed by CL § 17-307, or a holder of property that falls under the omnibus provision, CL § 17-308(b), the language of the Act appears to subject the "intangible personal property" that Maryland 529 holds for others to a presumption of abandonment after a three-year dormancy period. In other words, all three sections of the Act that might apply to Maryland 529 align on the point that the "intangible personal property" it holds is, if otherwise covered by the Act, subject to a three-year dormancy period.

Although we have concluded that the 529 *accounts* are not covered by the Act, these provisions of the Act, when applied to sums payable on uncashed checks, do not appear to raise the same thorny ambiguities that they do when applied to 529 accounts themselves. The unique tax advantages and long-term investment timelines of 529 accounts set them apart from other investment accounts in a way that the Act does not accommodate, but Maryland 529 distribution checks do not (so far as we are aware) contain unique features that set them apart in any relevant way from other checks evidencing rights to receive payment. Some of the uncashed checks that the agency has dealt with in the past are cash distributions to account holders or beneficiaries; others are tuition payments that Maryland 529 remits directly to educational institutions. *See* 2019 OLA Audit Report at 15, 21. Either way, the "owner" of the sum payable on a Maryland 529 check is the payee (whether that payee be an account holder, a beneficiary, or a school). CL § 17-101(k)(3). And a sum payable on a Maryland 529 check would clearly be either "payable" within the plain language of the omnibus and fiduciary provisions, *id*. §§ 17-306, 17-308(b), or "held for the [payee]" within the meaning of the public entities provision, *id*. § 17-307.[29]

---

[29] ABLE account holders may opt to load account funds onto a prepaid card that can be used for qualifying expenses, rather than taking distributions by check. *See* ABLE Discl. at 17-18. We understand that these prepaid cards have not prompted legal questions under the Abandoned Property Act to this point, and we therefore do not address how the Act might apply to them. On a separate note, we understand that Maryland 529 does not yet pay benefits by electronic transfer (as opposed to by check), and thus we do not address any issues that might arise related to such transfers.

Of course, as noted earlier, if such a sum no longer remains payable for some concrete reason—because it was paid through a separate instrument, for example, or because the check was issued in error—then the Act does not apply to it. *See Revenue Cabinet*, 702 S.W.2d at 436. In the ordinary course, however, the text of any of the three relevant provisions governs the sums payable on Maryland 529 checks, just as the provisions govern sums payable on other checks. *See Cory*, 120 Cal. App. 3d at 736. As such, if a sum payable on a Maryland 529 check remains unclaimed for three years, in our view it is presumed abandoned under the Act unless the payee corresponds about the sum or indicates an interest in it. *See* CL §§ 17-306, 17-307, 17-308(b).[30]

Importantly, we also think that application of the Act to the sums payable on Maryland 529 checks comports with the context and purpose of the relevant statutory schemes and avoids the illogical consequences that would follow from application of the Act to 529 accounts themselves. An authorization of the account holder precipitates the issuance of a check that draws down account funds because, at least as we understand it, Maryland 529 generally distributes money from an account only at the account holder's direction. *See, e.g.,* Educ. § 18-19A-04(b) ("Distributions shall be requested by the account holder").[31] Checks for amounts to be

---

[30] One provision of the Act expressly subjects sums payable on outstanding checks on which any "banking or financial organization or business association is directly liable" to a three-year dormancy period. CL § 17-301(b)(3). We doubt that this provision applies to Maryland 529 checks. The Act's definitions of "banking organization," "financial organization" and "business organization" do not contain any indication that the General Assembly intended them to encompass State agencies. *Id*. § 17-101(d), (e), (h); *see* 73 *Opinions of the Attorney General* 234, 236 (1988) (explaining that general statutory terms do not "extend to the State or its political subdivisions in the absence of some manifest legislative intention that they be included"). If the outside program managers administering any of the three 529 programs for Maryland 529 issue distribution checks on which the outside managers are directly liable, it seems likely that this provision would apply to such checks. If so, it would yield the same result as the Act's other provisions do for Maryland 529 checks that draw against 529 account balances: sums payable on the checks would be subject to a three-year dormancy period. *See* CL § 17-301(b)(3).

[31] According to the program disclosures, Maryland 529 distributes funds from an account without the account holder's authorization only in unusual circumstances—such as where a court order requires the distribution, or perhaps where a 529 program inadvertently accepts a

drawn from 529 accounts thus represent funds pushed from the accounts by the active choice of an account holder—not funds that would be removed from accounts and subjected to tax consequences only because of three years of inactivity. We do not perceive any affront to the nature of the 529 schemes in following the Act's prescriptions for regulating such unclaimed funds by turning them over to the Comptroller for safekeeping and location efforts.[32]

Indeed, subjecting sums payable on uncashed distribution checks to the Act would not trigger the illogical tax consequences that would follow from subjecting 529 accounts themselves to the Act. The IRS has not clarified whether unclaimed distribution checks carry tax consequences on their own, regardless of any subsequent transfers to an unclaimed property fund. *See* IRS Rev. Rul. 19-19, 2019-36 I.R.B. (holding, in the separate context of tax-advantaged retirement savings, that a payee's failure to cash a distribution check that she *received* does not alter the tax consequences of the distribution, but not addressing situations where the plan does not know whether a check was received and noting that the IRS continues to analyze "situations involving

---

contribution that exceeds statutory caps. *See* MCIP Discl. at 28 (court order exception); ABLE Discl. at 14 (excess contributions). Even in these circumstances, however, some event other than mere account inactivity triggers the distribution. The termination of an MPCT account due to the expiration of the benefits period (i.e., the period that ends ten-plus years after the beneficiary's projected college enrollment date) does not trigger a distribution unless the account holder authorizes it. MPCT Discl. at 12-13.

[32] To be clear, in reaching this conclusion with respect to sums payable on 529 distribution checks, we do not mean to suggest that the Act would be construed to apply to sums payable on uncashed checks (or any other property) held by State-sponsored retirement plans for public employees. The applicability of the Act to those plans would raise different questions that are outside the scope of this opinion. To take just one example, such plans might be governed by alternative schemes for the regulation of unclaimed property. *See* Md. Code Ann., State Pers. & Pens. § 21-506 (authorizing the State Retirement Agency to publish the names of participants with unclaimed contributions or benefits), § 21-311(d) (authorizing the State Retirement Agency to transfer unclaimed employee contributions to a fund used to pay out benefits); *see also supra* note 15 (discussing unique issues raised by governmental retirement plans). As our analysis with respect to both 529 accounts and checks shows, whether the Act applies in a particular context often turns upon interpretive conflicts, illogical consequences, and other considerations unique to that context. For this reason, our conclusions here should not be extended to another context without further analysis.

missing individuals"); Bruce J. McNeil, *Nonqualified Deferred Compensation Plans* § 1:10 (2022) ("What the ruling does not address is the degree to which modifications in the fact set must vary to impact the holding . . . . It is hoped that future guidance will be released to help plans handle variations on this uncashed check scenario . . . ."). But there is no need to decide that question here. Rather, the point is that, even if transfer of these sums to the Comptroller would create tax consequences not already generated by the issuance of the distribution checks, those tax consequences would not be illogical.

Unlike in the hypothetical situation where an *account* transfers to the Comptroller due to inactivity alone, the account holder has authorized the distribution of the sum payable on the check. This authorization probably means, in most cases, that tax penalties either will not result (because the beneficiary has qualifying expenses in the year of the distribution) or will be expected (because the account holder initiated the distribution notwithstanding a lack of qualifying expenses). *See* 2019 OLA Audit Report at 15-16 (distributions are often to "reimburse [participants] for tuition and qualified expenses already paid" and to pay requested refunds).

It is true that account holders and beneficiaries might realize some benefits if the sums payable on uncashed checks remained in their accounts rather than transferring to the Comptroller after three years. *See* 2019 OLA Audit Report at 22 (under Maryland 529 practice, sums payable on uncashed checks from the Prepaid Trust are credited "back to the associated accounts"). In the accounts, these funds could continue to appreciate attributable earnings; with the Comptroller, they will not. *See Vega*, 174 F.3d at 873 (explaining that the transfer of sums payable on uncashed checks from a pension plan to a state unclaimed property fund depletes the sums by halting their appreciation).

Yet, once again, because this consequence flows from the account holder's decision to trigger a distribution—and not merely from three years of inactivity on a long-term investment—it does not strike us as illogical. Most provisions in the Act, including those potentially relevant to Maryland 529, expressly contemplate transfer to the Comptroller of interest-bearing or invested property that is left unclaimed for more than three years. *See* CL § 17-306 (covering "all intangible personal property *and any income or increment on it*" held by fiduciaries (emphasis added)); § 17-308(b) (similar language in omnibus provision). These provisions no doubt cover a wide swath of funds that, if allowed to remain with

their source, would accrue interest or other appreciation. *See* 1954 Uniform Act § 9 cmt (explaining that the omnibus section applies to items such as "stocks, bonds, . . . interest, dividends, income, . . . together with any interest or increment thereon"). But the General Assembly, following the 1954 uniform law, nonetheless subjected such funds to the Act, presumably in large part because their transfer to the Comptroller improves the chances of finding the owners. *See id.*, Prefatory Note, at 2 (policy purposes).

We also do not think that application of the Act to sums payable on the uncashed distribution checks contravenes the 529 enabling statutes. Each of the enabling statutes, as we have discussed, prohibits the deposit of 529 funds into the State Treasury. *E.g.*, Educ. § 18-1903(f). Because funds that are transferred to the Comptroller as abandoned property are then deposited in the State Treasury, CL § 17-317, there is at least some question as to whether this prohibition should be read to exempt even the agency's uncashed distribution checks from the scope of the Abandoned Property Act. But the prohibition on Treasury deposits only applies to program moneys—for example, "[m]oney of the Trust," in the case of the Prepaid Trust, Educ. § 18-1903(f), and "[m]oney of the Plan" in the case of the Investment Plan, *id.* § 18-91A-05(c). That language is ambiguous as to whether it was intended to include sums payable on distribution checks. Such sums, as we have explained, represent moneys that the account holder has affirmatively decided to *remove* from the relevant 529 program. This decision, by triggering the issuance of a distribution check, creates an enforceable legal obligation that subjects the sums to non-program constraints from which 529 accounts themselves are shielded. *See generally Diemar & Kirk Co. v. Smart Styles, Inc.,* 261 N.C. 156, 159 (1964) (explaining that a check constitutes a contract between issuer and payee). Most obviously, it exposes the sums to outside interests—namely, those of the payees on the checks, who are not necessarily program participants. *See* 2019 OLA Audit Report at 21 (noting distribution checks payable to colleges and universities). Further, by issuing the distribution check, Maryland 529 has already taken the action required of it to push the funds out of its coffers. *See generally Messing v. Bank of America, N.A.*, 373 Md. 672, 678 (2003) (explaining that a check is "payable on demand"). Whether the funds in fact transfer out depends only on whether the payee or an endorsee presents the check for payment.

Thus, although the moneys technically remain with Maryland 529 until they clear the bank, there is reason to doubt that the General Assembly would have viewed those moneys as program

funds within the meaning of provisions like Educ. §§ 18-1903(f) and 18-91A-05(c). In other words, we cannot say from the statutory language alone that the General Assembly intended the prohibition on Treasury deposits of program moneys to include the deposit of these outgoing sums in the State Treasury for limited purposes under the Abandoned Property Act. After all, the legislative intent behind the prohibition was to prevent 529 funds from being "captured by the State," Hoffman Letter, and we do not think the General Assembly would have viewed it as improper "capture" for the Comptroller merely to take custody of sums payable on errant distribution checks for the primary purpose of safeguarding them for the payee after the account holder has already acted affirmatively to remove the funds from the account. *Cf. Connecticut Mutual Life Ins. Co. v. Moore*, 333 U.S. 541, 547 (1948) (explaining that the state acts as a "conservator" for abandoned funds under unclaimed property laws).

Instead, we must seek to harmonize the language of the 529 enabling statutes with the Abandoned Property Act. *See Immanuel*, 449 Md. at 87. The 529 statutes, while clearly reflecting an intent to protect 529 accounts from diversion to other State uses, do not specifically address the phenomenon of uncashed checks (or even mention the Abandoned Property Act, the plain language of which would otherwise apply to the sums payable on these checks).

In our view, interpreting the Abandoned Property Act to apply to sums payable on uncashed distribution checks but not to the accounts themselves achieves the requisite interpretative harmony. Under this interpretation, 529 accounts do not transfer to the State Treasury due to inactivity alone, in conformity with the safeguarding objective of the 529 enabling statutes and with the wider context and purpose of the 529 programs, which would be undermined by the illogical tax consequences and other ramifications of applying the Act to the accounts themselves. At the same time, under our interpretation, sums payable on uncashed distribution checks that remain unclaimed beyond the dormancy period will transfer to the Comptroller (assuming Maryland 529's efforts to contact the payee do not succeed). Such sums, as we have explained, remain unclaimed even after the account holder has actively chosen to pull them out of the tax-advantaged, long-term savings account. Unlike funds that sit undisturbed within 529 accounts themselves, sums payable on distribution checks that remain unclaimed for three years fall more logically within the sweep of the Abandoned Property Act's program for locating missing property owners than the 529 statutes' prohibitions against diversion of long-term education and disability savings.

We recognize that it may seem odd at first glance to distinguish sums payable on checks drawn against 529 accounts from the underlying accounts. After all, both types of funds come from the same pool. *See Vega*, 174 F.3d at 873 (noting, in the pension plan context, that "until the check to the beneficiary is actually presented to the plan for payment through the banking system, and paid, the money due to the beneficiary is an asset of the plan"). But the Maryland Act, like unclaimed property laws in general, treats sums payable on uncashed checks as a distinct type of intangible personal property. *See* CL § 17-101(m)(3) (business-to-business exemption for "outstanding checks"); § 17-301(b)(3) (addressing "sum[s] payable on a check" in the banking and financial sectors); *see also* RUUPA § 102(24) (defining "property" to include intangible property "evidenced by . . . [a] check"). Because the statute itself traces a distinction between sums payable on uncashed checks and other types of intangible property, we think that the same distinction logically bears upon the 529 programs, particularly given our conclusion that application of the Act to the uncashed checks (but not the underlying accounts) does not conflict with the General Assembly's statutory scheme for those programs.

We make two final points about compliance with the Act's requirements for uncashed checks. First, an organization may cancel or void an uncashed check, but this action by itself does not alter the organization's obligation to report the sum payable on the check as abandoned property. The Act's presumption of abandonment applies to the underlying payment obligation that the check records, not the check itself. *Cory*, 120 Cal. App. 3d at 736. As we have explained, so long as the underlying sum remains due to the payee, it remains subject to the Act's mandates. *See id*.; *Revenue Cabinet*, 702 S.W.2d at 436. Were the rule otherwise, the Act's regulation of sums payable on uncashed checks would have little meaning: financial institutions and other property holders could evade it and retain the windfall of unclaimed sums by voiding uncashed checks before the end of the three-year dormancy period. *See Treasurer & Receiver General v. John Hancock Mut. Life Ins. Co.*, 388 Mass. 410, 417-18 (1983) (rejecting an interpretation that "would create a situation in which the purposes of the [Massachusetts] abandoned property act, to reunite the property with its owners and to employ the property for public purposes in the interim, could not be achieved"); *cf.* RUUPA § 1005 & cmt. (providing, in line with the case law on uncashed checks, that to overcome the presumption that an uncashed check corresponds to an undischarged obligation to pay, the holder may prove the lack of any such undischarged obligation).

Second, before reporting and transferring sums payable on uncashed checks to the Comptroller upon expiration of the three-year dormancy period, Maryland 529 must send written notice to the payee by first-class mail if the sum exceeds $100.  CL § 17-308.2.

### 2.    Out-of-State Property Owners

In responding to your agency's questions, we have been focused on Maryland's Abandoned Property Act.  We note, however, that where Maryland 529 holds unclaimed property that belongs to people in other states, the unclaimed property laws of the other states will typically apply.  *See* CL § 17-309; *Delaware v. Pennsylvania*, 143 S. Ct. 696, 701-03 (2023) (explaining that, under federal common law, the state of the last known address of the owner has primary power to escheat unclaimed intangible property, except where Congress has abrogated the common law rule for money orders, traveler's checks, and similar financial products).

For uncashed checks, if the payee's last known address is in another state, Maryland 529 should consult the laws of that state to determine if and when it must treat the unclaimed sum as abandoned.  *See* CL § 17-309.  Many state laws subject uncashed checks to a three-year dormancy period.  *See generally* RUUPA §§ 102(24)(B)(i), 201(13), 201 cmt. (three-year dormancy period for most property types, including checks).

Similarly, for 529 accounts held for participants who reside in other states, Maryland 529 should consult the unclaimed property laws of the other states.  *See Delaware*, 143 S. Ct. at 701-03. Unlike Maryland's Act, the unclaimed property laws of some other states do apply to 529 accounts and provide that they shall be presumed abandoned in certain circumstances.  *E.g.*, Colo. Rev. Stat. Ann. § 38-13-203 (following RUUPA's 30-year waiting period before dormancy period may begin for college savings accounts).[33]

---

[33] Although the issue is not one of Maryland law, we note that under the laws of other states that follow RUUPA in regulating unclaimed 529 accounts, the relevant ownership address would appear to be that of the account holder.  *See* RUUPA § 102 cmt. ("[F]or bank accounts, brokerage accounts, IRAs, and other similar property, the legal owner of the account would take precedence over a named beneficiary who does not yet have legal ownership of the account.").

### III
### Conclusion

The extent to which the Abandoned Property Act should apply to Maryland 529 is an issue ripe for legislative consideration and one to which other state legislatures have spoken. As Maryland law stands now, we conclude that the Act does not apply to Maryland 529 accounts. The General Assembly likely did not intend the Act's three-year, generally applicable dormancy periods to govern the tax-advantaged, long-term savings vehicles that the 529 enabling statutes established. But our view is that the Act as currently written likely *does* apply to sums payable on uncashed distribution checks that draw against 529 account balances, although the question is certainly close. As a final note, Maryland 529 should consult the unclaimed property laws of other states when it holds unclaimed property, including unclaimed accounts or checks, for out-of-state participants.

Anthony G. Brown
Attorney General of Maryland

Ben Harrington
Assistant Attorney General

Patrick B. Hughes
Chief Counsel, Opinions and Advice

\* Meghan Marek, Assistant Attorney General, contributed significantly to the preparation of this opinion.